**STATE of Missouri, Respondent,**

v.

**Shawna J. CLARK, Appellant.**

**No. 23111.**

Missouri Court of Appeals,
Southern District,
Division Two.

July 27, 2000.

Motion for Rehearing and Transfer to
Supreme Court Denied Aug. 17, 2000.

Application for Transfer Denied
Oct. 3, 2000.

3. Defendant's Motion to Dismiss Appeal is    denied.

Amy M. Bartholow, Asst. Public Defender, Columbia, for appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., Catherine Chatman, Asst. Atty. Gen., Jefferson City, for respondent.

CROW, Judge.

A jury found Appellant guilty of conspiracy to commit murder in the first degree, § 564.016, RSMo 1994, and unlawful use of a weapon, § 571.030, RSMo Cum.Supp. 1997. The jury assessed punishment at fifteen years' imprisonment and five years' imprisonment, respectively. The trial court entered judgment per the verdicts, running the sentences concurrently.

Appellant presents four assignments of error; all pertain to evidentiary rulings.

As Appellant does not challenge the sufficiency of the evidence to support the verdicts, this opinion synopsizes only the evidence necessary to address the claims of error, viewing it in the light most favorable to the judgment. *State v. Hall,* 982

S.W.2d 675, 680[1] (Mo. banc 1998), *cert. denied*, 526 U.S. 1151, 119 S.Ct. 2034, 143 L.Ed.2d 1043 (1999).

In 1997, Michael Murphy, a Springfield police officer, was assigned to the Combined Ozarks Multi-jurisdictional Enforcement Team ("COMET")[1] as a narcotics investigator, performing "primarily undercover work."

On June 3, 1997, Murphy and one "Corky" Alsip were at an apartment in Hollister where Appellant resided. Murphy bought a "quarter pound of marijuana" from Appellant, handing the money to Alsip, who handed it to Appellant.

On July 24, 1997, at the same apartment, Murphy made another marijuana buy from Appellant. This time, Murphy supplied the money to Appellant directly.

Around "the first week of August [1997]," Murphy began using the services of a "confidential informant," Deborah _____. She knew Appellant.

Murphy wanted to make a third buy from Appellant.[2] At Murphy's request, Deborah "set up" a buy for September 11, 1997.

Late that evening, Deborah, Murphy and another undercover officer—"Toby"— picked up Appellant. With Appellant occupying the "front passenger seat" and Deborah and Murphy occupying the "back bench seat," Toby drove the quartet to a nearby house. There, he stopped because Appellant said she wanted to go in and "talk to somebody real quick."

Appellant exited the vehicle, leaving her purse on the "floorboard." Murphy and Toby looked in the purse and saw "two loaded semi-automatic pistols: a .22 pistol and a .25 caliber pistol." The officers left the pistols undisturbed.

Appellant returned to the vehicle and Toby drove the quartet to a mobile home "in Stone County down by the Lampe area." Appellant said it was her brother's residence. She went in to "see what he would charge." Upon returning, Appellant "quoted a price of $2300."

That was "too high," so the quartet went to the residence of Barry Dean Davis in Reeds Spring. There, Murphy supplied Appellant $2,000. She entered the residence, then returned a few minutes later with "a pound of marijuana." She tossed it to Murphy and said "they had five more pounds" if he was interested.

Toby, Murphy and Deborah thereafter took Appellant to a "hotel resort" in Branson and "dropped her off."

The following day (September 12, 1997), COMET officers obtained a search warrant for Barry Dean Davis's residence and seized approximately "nine pounds of marijuana." Davis was arrested.

About 8:00 p.m. that date, Deborah received a call from Appellant. Appellant told Deborah that "Davis had been busted," that Murphy "was a cop," and that she (Appellant) "wanted to know where he was at and where she could find him at." Appellant explained that Davis's arrest had been blamed on her and if she went down, she "wasn't going down alone." According to Deborah, Appellant's "exact words" were: "I mean what I said. I want Mike dead. And I will put a bullet in his head." Appellant asked Deborah to find Murphy and "bring him to her." Appellant supplied Deborah a "pager number" by which she could be contacted.

Deborah notified Murphy about Appellant's call.

At 1:06 a.m., September 13, 1997—some five hours after Appellant's call—Appellant called Deborah again, asking whether she

---

1. COMET, formed in 1993, was a "federally-funded task force comprising six counties . . . Stone, Taney, Webster, Christian, Greene and Polk . . . and most of the municipalities in that area."

2. It was COMET's practice to make three buys from a seller before seeking prosecution. The purpose of the policy was to demonstrate the seller had "an on-going pattern of criminal behavior."

had found Murphy. Deborah replied that "we were working on it." Deborah recalled Appellant saying: "I want Murphy found and found now. This involves family. I have to answer to my father, and when I do, blood's going to flow. I don't plan on being there by myself. Bush Clark always said, 'loose lips, sink ships.' ... Just find him and bring him to me. I want to see him die and die slow."

At 3:14 a.m., Appellant called Deborah again. Deborah told Appellant some friends were watching Murphy's residence. Appellant admonished Deborah: "Don't let him get away ... I need him."

After that call, Deborah turned off her telephone but left her answering machine on. She went to bed. Appellant continued calling, leaving "message after message" on the machine.

About 6:30 p.m. that day (September 13, 1997), Murphy and Sergeant Timothy J. Roussett of the Missouri State Highway Patrol (the "Officer in Charge" of COMET) met Deborah in Ozark. Roussett developed a plan to arrest Appellant, selecting "Guitars & Cadillacs" (inferably a nightclub) in Branson as the arrest site. Roussett explained: "[T]he decision was made to effect the arrest inside ... Branson where we could have a uniformed officer present as opposed to trying to do it somewhere out in the county where it would be harder to get a uniformed officer."

Murphy supplied Deborah a "portable cellular phone" equipped with a tape recorder. Deborah phoned Appellant's "pager" and spoke to Appellant. Deborah told Appellant she (Deborah) had found Murphy and would "have him in about 30 minutes."

Appellant said, "Let me call you back." Deborah gave Appellant the number of the cellular phone.

Deborah, Murphy and Roussett drove from Ozark to Guitars & Cadillacs. Murphy recalled: "We ... contacted the Bran-

son Police Department and had them send over some officers[.]"

Deborah and Murphy waited in Murphy's vehicle on the Guitars & Cadillacs parking lot. Roussett waited in another vehicle.

Deborah received a call from Appellant. Appellant told Deborah to bring Murphy to a "low water bridge" on Railey Creek.

Deborah told Appellant, "I'll try and find it." However, adhering to the plan, Deborah, Murphy and Roussett remained at Guitars & Cadillacs.

Deborah eventually received a call from Jason Hamann. He said he was calling for Appellant, who was waiting for Deborah.

Deborah told Hamann she was in Branson and needed Appellant to call her.

Deborah thereafter received a call from Appellant. Deborah told Appellant that "we ran into a problem," that Murphy was at Guitars & Cadillacs, and that "Ty" was "pourin' liquor down him."

Appellant told Deborah to keep Murphy there, that she was on her way.

Some time later, a white Camaro entered the parking lot at Guitars & Cadillacs. Appellant was on the passenger side. She exited, entered Guitars & Cadillacs, and phoned Deborah, evidently from a "pay phone." Appellant asked Deborah where she was.

Deborah told Appellant she was at the "Amoco Station ... right next door" buying cigarettes and Murphy was "about to puke" on her.

Appellant replied: "I'm going out the door. I'll see you in a minute."

Murphy saw Appellant exit Guitars & Cadillacs and walk "very briskly toward the Amoco parking lot."

As Appellant reached "the Amoco building," Roussett exited his vehicle and approached her on foot. Displaying his badge, he yelled: "Police officer. You're under arrest." He ordered her "to get up

against the side of the building." She complied.

Roussett asked Appellant whether she was armed. She said she was. Then, according to Roussett, "[S]he raised her shirt and the gun was inside her shorts underneath her shirt."

By that time, Officer Shane Farmer of the Branson Police Department had reached the site. He seized the gun, a "Raven Arms . . . 25 caliber semiautomatic handgun." It was loaded and a round was in the chamber. Farmer handed the gun to Roussett.

After arresting Appellant, Roussett arrested Jason Hamann outside Guitars & Cadillacs.[3] Hamann was carrying a "Llama brand .380 semi-automatic pistol."

The next day (September 14, 1997), the Prosecuting Attorney filed a complaint in the Circuit Court of Taney County charging Appellant with conspiracy to murder Murphy and unlawful use of a weapon (carrying it concealed upon her person).

On October 1, 1997, Special Agent Joy Branch of the Bureau of Alcohol, Tobacco and Firearms interviewed Appellant in jail. At the outset, Branch, using a printed form, advised Appellant of her "Miranda" rights.[4] Appellant signed the form indicating she understood them. At trial, over Appellant's objection (discussed *infra*), Branch gave this account of the interview:

"She told me that she had been staying with [Deborah] and that [Deborah] had needed some help getting marijuana for her and her boyfriend. And that the night that Barry was arrested . . . I believe maybe the next day . . . she had been fingered as a person who had set

Barry Davis up, and she was very concerned about that. And she was upset. And then, went to [Deborah] and was concerned that Mike was a police officer and that he was responsible for arresting Barry Davis, and her being involved as a possible snitch in that particular case. . . . She said that she had taken a hit of acid [on September 13, 1997]; had used alcohol on that day.

And I believe maybe smoked marijuana . . . and drank Crown Royal during the day . . . that she had made arrangements with [Deborah] to meet with Mike. . . . She told me that she remembered talking to [Deborah], and wanting her to bring Mike to her."

Trial began June 21, 1999. At the outset, outside the presence of the venire, the trial court announced rulings on sundry issues. The court's remarks included this:

"There is a Motion by the Defense to Suppress the Testimony of Joy Branch or statements made to Joy Branch nine days after the arrest of the defendant. And that motion is overruled, ah, at this point."[5]

Branch was the fourth witness called by the State. Before she was sworn, Appellant's lawyer[6] asked for, and was granted, a "sidebar" conference. This dialogue ensued:

"[Appellant's lawyer]: Judge, at this time, I would again move to suppress any testimony of this witness, Joy Branch. It's my belief that they're going to offer evidence that Shawna made statements, ah, while incarcerated at the Branson Police Jail nine days after the initiation of judicial proceedings were in

---

**3.** It is inferable, although not directly established, that Hamann was the driver of the Camaro in which Appellant arrived at Guitars & Cadillacs.

**4.** *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

**5.** This court suspects the trial court was referring to Appellant's statements to Branch on October 1, 1997, eighteen days after Appel-

lant's arrest. The record on appeal contains no written motion by Appellant to suppress those statements. This court has carefully examined the trial court's docket sheet and has found no mention of such a motion.

**6.** The lawyer who represented Appellant at trial is not the lawyer representing her in this appeal.

effect against her by Associate Court of Taney. The Complaint alleging the same facts and the same events that was questioned by Joy Branch. At this time, I think that any conversations are—should not be admitted due to the Sixth Amendment right to counsel that attaches automatically any time formal initiated judicial proceedings have been enacted against a defendant, and that a waiver, albeit signed is not—does not do away with the Sixth Amendment right. THE COURT: Well, my—the ruling will be the same. That will be overruled. I'll hear the evidence and you can object at the proper time."

When the prosecutor asked Branch whether Appellant mentioned "the drug arrest and the sale of marijuana that took place on the 12th of September," Appellant's lawyer said:

"Judge, I'll object. These are statements that should be suppressed and for the amendments, the arguments I previously made to the Court."

The trial court sustained the objection "as to that question."

The prosecutor then asked Branch whether Appellant said she thought Murphy was a police officer.

Appellant's lawyer said: "Same objection, your Honor. Continuing objection."

The trial court overruled that objection, whereupon Branch gave the testimony quoted earlier in this opinion. During that testimony, just before Branch mentioned that Appellant said she had "taken a hit of acid," Appellant's lawyer said, "Same objection, your Honor." The trial court overruled the objection.

Appellant's first point relied on is:

"The trial court erred in failing to suppress Ms. Clark's Oct. 1, 1997, statement to ATF officer, Joy Branch, and in allowing Branch to testify as to Ms. Clark's statements at trial, because Ms. Clark's statement was taken in deroga-

tion of her right to counsel, as guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution and Article I, Sections 18(a) and 19 of the Missouri Constitution, in that the State filed its formal complaint against Ms. Clark on September 14, 1997, Ms. Clark was formally arraigned on September 15, 1997, and appointed counsel entered an appearance on Ms. Clark's behalf on September 25, 1997. Therefore, Ms. Clark had asserted her Sixth Amendment right to counsel, which had attached, and any purported waiver of her right to counsel during Branch's police-initiated interrogation was invalid."

This court gathers from the argument following the point that (1) Appellant does not challenge the admissibility of her statements to Branch on Fifth Amendment grounds—*Miranda*[7] and its progeny—and (2) Appellant does not maintain her right under Mo. Const. Art. I, § 18(a) (1945), to appear and defend, in person and by counsel, in criminal prosecutions is any broader than her corresponding right under the Sixth Amendment to the Constitution of the United States.

Starting from there, the first relevant case is *Michigan v. Jackson*, 475 U.S. 625, 106 S.Ct. 1404, 89 L.Ed.2d 631 (1986). There, a divided Supreme Court of the United States held: "[I]f police initiate interrogation after a defendant's assertion, at an arraignment or similar proceeding, of his right to counsel, any waiver of the defendant's right to counsel for that police-initiated interrogation is invalid." 475 U.S. at 636, 106 S.Ct. at 1411[9].

Two years later, the Supreme Court of the United States decided *Patterson v. Illinois*, 487 U.S. 285, 108 S.Ct. 2389, 101 L.Ed.2d 261 (1988). There, a suspect was arrested for murder. 487 U.S. at 287, 108 S.Ct. at 2392. While he was in custody, a grand jury indicted him for the murder. 487 U.S. at 288, 108 S.Ct. at 2392. A

**7.** Footnote 4, *supra.*

police officer informed the accused of the indictment, whereupon the accused asked why one of his colleagues had not been indicted, as he "did everything." 487 U.S. at 288, 108 S.Ct. at 2392. Thereafter, the accused waived his "Miranda" rights [8] and gave two incriminatory statements. 487 U.S. at 288, 108 S.Ct. at 2392. Before trial, the accused moved to suppress the statements; the trial court denied the motion and received them in evidence. 487 U.S. at 289, 108 S.Ct. at 2393.

In the Supreme Court of the United States, the accused claimed that because his Sixth Amendment right to counsel arose with his indictment, the police were thereafter barred from initiating interrogation. 487 U.S. at 290, 108 S.Ct. at 2393. Affirming the conviction in a five-to-four decision, the Supreme Court held:

> "The fact that petitioner's Sixth Amendment right came into existence with his indictment, *i.e.*, that he had such a right at the time of his questioning, does not distinguish him from the preindictment interrogatee whose right to counsel is in existence and available for his exercise while he is questioned. Had petitioner indicated he wanted the assistance of counsel, the authorities' interview with him would have stopped, and further questioning would have been forbidden (unless petitioner called for such a meeting). This was our holding in *Michigan v. Jackson* ...."

487 U.S. at 290–91, 108 S.Ct. at 2394.

*Patterson* acknowledged that once an accused expresses his desire to deal with the police only through counsel, he should not be subject to further interrogation until counsel has been made available to him, unless he initiates further communication himself. 487 U.S. at 291, 108 S.Ct. at 2394. However, where the accused, after being advised of his right to counsel, knowingly and intelligently chooses to face interrogation alone, *Patterson* held there is "no reason why the uncounseled state-

ments he then makes must be excluded at his trial." 487 U.S. at 291, 108 S.Ct. at 2394.

The Supreme Court then considered whether the accused had knowingly and intelligently waived his Sixth Amendment right. 487 U.S. at 292, 108 S.Ct. at 2394. On that issue, the Supreme Court said:

> "[I]t is our view that whatever warnings suffice for *Miranda*'s purposes will also be sufficient in the context of postindictment questioning.... So long as the accused is made aware of the 'dangers and disadvantages of self-representation' during postindictment questioning, by use of the *Miranda* warnings, his waiver of his Sixth Amendment right to counsel at such questioning is 'knowing and intelligent.'"

487 U.S. at 298, 300, 108 S.Ct. at 2398–99.

Two years after *Patterson*, the Supreme Court of Missouri decided *State v. Reese*, 795 S.W.2d 69 (Mo. banc 1990), *cert. denied*, 498 U.S. 1110, 111 S.Ct. 1025, 112 L.Ed.2d 1106 (1991). There, a suspect was arrested, charged with multiple murders, and taken before a judge. 795 S.W.2d at 71. The judge advised the accused of the charges, his right to retain counsel, and his right to request assignment of counsel if he was indigent. *Id.* The accused said he did not believe he could afford counsel, and was told that forms for requesting appointed counsel were available at jail. *Id.* He did not suggest to the judge or law enforcement officers that he wanted a lawyer. *Id.*

The next morning, officers interviewed the accused. *Id.* They advised him of his "Miranda" rights,[9] and he signed a written waiver. *Id.* An officer offered to phone a lawyer for the accused, but the accused stated he "didn't do it" and did not need a lawyer or want one. *Id.* An officer then told the accused he had to have a lawyer at his preliminary hearing, and the officer had to fill out a form to determine whether

8. Footnote 4, *supra.*

9. Footnote 4, *supra.*

the accused was eligible for public defender services. *Id.* The accused completed the form, checking "yes" to a question asking whether he was requesting that the public defender be provided as his lawyer. *Id.* Ultimately, after several hours of questioning, the accused confessed to the murders. *Id.* at 71–72. The confession was received in evidence. *Id.* at 72.

The Supreme Court of Missouri rejected the accused's argument that the confession was obtained in violation of his Sixth Amendment right to counsel. The opinion said:

> "We conclude that this case is closer to *Patterson* than to *Jackson.* Counsel had not been appointed. The defendant's eligibility for the public defender's services had not been determined. There was no request for counsel during interrogation. There was, by contrast, an explicit waiver. The authorities made it clear to the defendant, numerous times, that counsel would be available to him if he would only say the word. The mere mention of counsel by the defendant is not sufficient to preclude further police questioning. There must be a request."

*Id.* at 73 (footnote omitted).

The parties cite a multitude of cases besides the three discussed above—*Jackson, Patterson* and *Reese.* However, for the reasons that follow, it is unnecessary to discuss any of them.

Rule 24.05 [10] reads:

> "Requests that evidence be suppressed shall be raised by motion before trial; however, the court may in its discretion entertain a motion to suppress evidence at any time during trial."

In *State v. Brown,* 755 S.W.2d 749 (Mo. App. E.D.1988), the accused, "on the morning of trial, but before the trial commenced," moved to suppress an incriminatory statement. *Id.* at 751. The Eastern

District of this Court held the motion was filed "before trial," hence it was timely. *Id.* at [1]. For the purpose of adjudicating Appellant's first point in this appeal, this court shall assume, *arguendo,* that *Brown* correctly construed Rule 24.05. Nonetheless, a morning-of-trial motion to suppress puts a trial court in a precarious spot, allowing scant time for analysis or research.

As reported earlier,[11] the record contains no written motion to suppress Appellant's statements to Branch. The only reference to such a motion prior to jury selection was the trial court's remark, immediately before voir dire, that a motion by the "Defense" to suppress "statements made to Joy Branch nine days after the arrest of the defendant" was overruled. The trial court's remark is bare of any indication that the motion was based on the Sixth Amendment—or any other constitutional provision for that matter—and the record is likewise void of any evidence regarding the motion.

■ A trial court will not be convicted of error in admitting testimony for a reason not presented to it, hence reasons urged in a brief which were not advanced to the trial court are of no avail. *State v. Stevens,* 467 S.W.2d 10, 18[4] (Mo.1971), *cert. denied,* 404 U.S. 994, 92 S.Ct. 531, 30 L.Ed.2d 546 (1971). Consequently, had Appellant's lawyer said nothing else to the trial court challenging the admissibility of Appellant's statements to Branch, Appellant's first point would be futile.

However, just before Branch testified, Appellant's lawyer told the trial court Appellant made the statements to Branch "nine days after the initiation of judicial proceedings" in the "Associate Court of Taney." Therefore, argued Appellant's lawyer, Appellant's statements to Branch should be suppressed "due to the Sixth Amendment right to counsel that attaches

**10.** References to Rules are to Missouri Rules of Criminal Procedure (2000). Rule 24.05 has remained unchanged since 1980.

**11.** Footnote 5, *supra.*

automatically any time formal initiated judicial proceedings have been enacted against a defendant," and a signed waiver "does not do away with the Sixth Amendment right."

Appellant's lawyer's statement was incorrect, factually and legally.

Factually, Appellant's statements to Branch were made seventeen days after the prosecutor filed the complaint against Appellant in the Circuit Court of Taney County, not nine days after that event.

■ Legally, even after a complaint has been filed and an accused has been before a judge, interrogation is not barred where the accused has been advised of his right to counsel and has made no request for counsel, but instead has waived his right to counsel. *Reese*, 795 S.W.2d at 73.

Appellant maintains the record demonstrates she "asserted her Sixth Amendment right to counsel" prior to the date Branch questioned her (October 1, 1997). In support of that hypothesis, Appellant directs this court to the trial court's docket sheet.

A docket entry dated "9 15 97" shows Appellant appeared in court without counsel on the conspiracy and weapon charges, and bond was set at $250,000. The entry is silent as to whether Appellant was informed of her right to counsel, whether she said she would retain counsel, or whether she requested appointed counsel.

The next entry on the docket sheet is dated "9 25 97." It shows: "Entry of Appearance by Ass't P D Wallace[.] Motion to Reduce Bond filed by Ass't P D Wallace[.] Notice of Hearing 9/29/97 9 AM and Motion to Shorten Time filed by Ass't P D Wallace[.]"

The final docket entry prior to Branch's interrogation of Appellant is dated "9 29 97." It shows: "On hearing the Bond is reduced to $100,000.00[.]"

Appellant insists that inasmuch as (1) a lawyer had been appointed for her and filed motions on her behalf—a motion to reduce bond and a motion to shorten time—and (2) the lawyer had represented her at a hearing on the motions, she had, as a matter of record, invoked her Six Amendment right to counsel before the October 1, 1997, encounter with Branch.

Whether the docket sheet might have arguably supported Appellant's hypothesis in the trial court is an issue this court need not decide. The reason is that nothing in the record shows the docket entries were brought to the attention of the trial court as an evidentiary basis for Appellant's morning-of-trial motion to suppress.

This court cannot assume the trial court was aware of the entries, which were made twenty-one months before trial. It is obvious from the record that the judge before whom the case was pending at the time the entries were made was not the judge who ultimately presided at Appellant's trial. Indeed, as best this court can deduce from the record, the judge who presided at trial was at least the fourth judge involved in the case.

Furthermore, even had the docket sheet been shown to the trial court in support of Appellant's motion, it would have demonstrated only that a lawyer entered an appearance as Appellant's counsel eleven days after the prosecutor filed the complaint. In arguing Appellant's motion to the trial court, Appellant's lawyer said Appellant's statements to Branch were made "nine days after the initiation of judicial proceedings." Thus, the docket sheet would not have shown Appellant was represented by counsel when, according to Appellant's lawyer, Appellant made her statements to Branch.

Appellant cites no case indicating the trial court should have automatically assumed Appellant invoked her Sixth Amendment right to counsel when she appeared before the judge September 15, 1997, on the complaint filed the preceding day. On that subject, as we have seen, the accused in *Reese*, 795 S.W.2d at 69, did not assert his Sixth Amendment right when

brought before a judge on murder charges, hence his incriminatory statements after his court appearance were admissible at his trial.

Had Appellant asserted her Sixth Amendment right by telling either a law enforcement officer or the judge before whom she appeared September 15, 1997, that she wanted counsel, she could have easily established such fact by testifying to that effect in support of her motion to suppress, prior to Branch's testimony. As it was, the only evidence before the trial court when Branch testified about Appellant's statements was Branch's testimony that Appellant, at the start of the interview, waived her right to counsel.

■ In sum, the record shows the only ground presented to the trial court for suppressing Appellant's statements to Branch was that the statements were made after "judicial proceedings" had been commenced and Appellant's Sixth Amendment right to counsel had "automatically" attached. Because *Patterson*, 487 U.S. 285, 108 S.Ct. 2389, 101 L.Ed.2d 261, and *Reese*, 795 S.W.2d 69, hold an accused's incriminatory statements to law enforcement officers after he has been formally charged are not automatically inadmissible, this court holds Appellant's lawyer's objection at trial, unaccompanied by any evidence, presented *no basis for excluding* Appellant's statements to Branch.

■ Appellant's appointed counsel in this appeal, with praiseworthy resourcefulness,[12] presents a broader challenge to the admissibility of Appellant's statements to Branch than Appellant asserted at trial. However, because an accused may not, on appeal, broaden the objection made at trial, *State v. Alexander*, 620 S.W.2d 380, 384[5] n. 4 (Mo. banc 1981), this court holds the theory of inadmissibility in Appellant's first point is ineligible for review.

Appellant's second point concerns the testimony of Officer Farmer. As recounted earlier, Farmer arrived at the arrest site immediately after Roussett placed Appellant under arrest. Farmer seized the handgun Appellant was carrying, examined it to see whether it was loaded, and handed it to Roussett.

A deposition was taken from Farmer four months before trial. As this court understands the record, the deposition was taken by Appellant's lawyer.[13] The prosecutor was present. Appellant, although free on bond, did not attend the deposition.

Farmer was subsequently diagnosed with a grave illness and was physically unable to appear at trial.

The prosecutor offered excerpts from Farmer's deposition in evidence. Appellant's lawyer objected on the ground that this would violate Appellant's "Fifth [sic] Amendment right to confrontation."

The trial court overruled the objection.

Appellant's second point avers the trial court plainly erred in receiving Farmer's deposition testimony in evidence, as this violated her right to personally confront Farmer guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution and Article I, § 18(a) of the Constitution of Missouri (1945). Appellant proclaims she did not personally waive her right to be present at Farmer's deposition.

■ Appellant concedes her second point is not preserved for review, as it was not raised in her motion for new trial. Rule 29.11(d); *State v. Peterson*, 518 S.W.2d 1, 3[2] (Mo.1974). Consequently, Appellant seeks plain error relief per Rule 30.20. Such relief is appropriate only when the alleged error so substantially affects the rights of the accused that a manifest injustice or miscarriage of justice results. *State v. Isa*, 850 S.W.2d 876, 884[2] (Mo. banc 1993).

---

12.  The briefs by both sides are excellent.

13.  The deposition has not been filed in this court.

A discussion of the constitutional implications of using deposition testimony against an accused in a criminal case appears in *State v. Glaese*, 956 S.W.2d 926, 930–33 (Mo.App. S.D.1997), and need not be repeated here. In adjudicating Appellant's second point, this court shall assume, without deciding, that the trial court erred in receiving the excerpts from Farmer's deposition offered by the State.

The State maintains any such error was harmless beyond a reasonable doubt.[14]

■ Appellant asserts Farmer took the gun from her, hence his testimony "provided the chain of custody" for its admission in evidence. Appellant also argues that Farmer's testimony "emphasized the fact that [Appellant] had made threats on a police officers [sic] life, and created sympathy in the minds of the jury that one of their own Branson police officers was put at risk by [Appellant]."

This court disagrees. Roussett (who testified in person at Appellant's trial) watched Farmer seize the gun and saw it was loaded. Farmer handed the gun to Roussett after seizing it. Roussett identified the gun at trial, whereupon the trial court received it in evidence. Appellant assigns no error in regard to that ruling.

Appellant's complaint about Farmer's testimony regarding threats on a police officer's life is apparently directed toward Farmer's explanation for his presence at Guitars & Cadillacs. Farmer testified he was directed by his supervisor to assist COMET in arresting "some individuals who had threatened a police officer." It was clear from the evidence that the officer who had been threatened was not Farmer or any other Branson officer. Furthermore, Deborah had already testified about Appellant's threats against Murphy, Roussett had testified about the plan to arrest Appellant, and Murphy had testified about enlisting Branson officers to aid

in the arrest. Finally, Appellant, testifying before the jury, admitted she was carrying the gun at the time she was arrested.

Where challenged evidence is cumulative to other evidence, the admissibility of which is unassailed, any error in receiving the disputed evidence is harmless beyond a reasonable doubt. *Cf. State v. Fuente*, 871 S.W.2d 438, 443–44 (Mo. banc 1994); *State v. Duncan*, 945 S.W.2d 643, 648–49 (Mo.App. S.D.1997). This court holds Farmer's testimony was cumulative to the testimony of Deborah, Roussett, Murphy and Appellant identified in the preceding paragraph. Consequently, any error in receiving Farmer's testimony was harmless beyond a reasonable doubt. Appellant's second point is denied.

Her third point:

"The trial court erred in overruling [Appellant's] motion to suppress and in allowing the State to introduce testimony regarding the weapons found during the illegal search of [Appellant's] purse on September 12, 1997, in violation of [her] right to be free from illegal searches, guaranteed by the 4th and 14th Amendments to the United States Constitution and Article I, Section 15 of the Missouri Constitution, in that Officers Murphy and [Toby] had no authority to open and search [Appellant's] closed purse because they did not have a warrant, [Appellant] had a reasonable expectation of privacy in her closed purse and she had not abandoned it, there was no immediate danger to the officers and no exigent circumstances to justify the search. Rather, the search was conducted to find evidence of a crime, which does not justify the violation of [Appellant's] privacy interest in her purse."

The search referred to in the above point is described earlier in this opinion. It occurred the night Toby, Deborah and

---

**14.** The State appears to agree with Appellant's contention that in determining whether Appellant's second point warrants plain error relief, the test is whether the error was harmless beyond a reasonable doubt. *See: State v. Dexter*, 954 S.W.2d 332, 340 (Mo. banc 1997).

Murphy picked up Appellant in quest of a marijuana buy. When Appellant got out of the vehicle and entered a house, leaving her purse in the vehicle, Murphy and Toby looked in it and saw two pistols. At trial, Murphy identified the pistol Appellant was carrying when Roussett arrested her as one of those he (Murphy) had seen in the purse.

Three months before trial, Appellant filed a motion to suppress all testimony regarding the purse search. The trial court heard evidence on the motion ahead of trial. Murphy testified that prior to the date when the search occurred, he had been told by Deborah that Appellant believed he was a police officer and that Appellant "had been carrying a gun." Consequently, explained Murphy, when Appellant exited the vehicle, leaving her purse on the floorboard, he and Toby "for officer safety purposes ... looked in the bag to look for weapons." Murphy conceded Appellant gave no consent to the search.

The prosecutor argued to the trial court that the search was constitutionally permissible for two reasons: first, Appellant had no expectation of privacy when she left her purse in the vehicle, and second, Murphy and Toby had the right "for their own safety and protection" to see whether Appellant's purse contained weapons.

The trial court ruled:

"I think the actions of the officers ... were reasonable for their own safety based upon the prior knowledge that the officer had, that the defendant suspected him of being a police officer and was known to carry a handgun. And I think for his own safety he could look."

At trial, Appellant's lawyer registered no objection when Murphy testified about looking in Appellant's purse and seeing the pistols. Murphy's testimony was the only evidence about the incident.

In Missouri, when a motion to suppress is denied and the evidence is offered at the subsequent trial, a timely objection to the evidence must be made in order to preserve the question for appellate review. *State v. Kelley*, 953 S.W.2d 73, 87[30] (Mo. App. S.D.1997), *cert. denied*, 522 U.S. 1151, 118 S.Ct. 1173, 140 L.Ed.2d 182 (1998). Because Appellant failed to meet that requirement, the only possible relief available to her on her third point is for plain error under Rule 30.20. For the reasons that follow, this court holds such relief is unwarranted.

Appellant testified that in March 1995 she was beaten by a man with whom she was living. From then on, avowed Appellant, she carried a firearm to protect herself because "he's quite a bit bigger than I am[.]" Appellant's testimony about the arrest included this:

"Q Do you remember having the gun on you?

A I always had a gun on me.

Q And you had that .25 caliber?

A In my shorts, sir, I did."

Because Appellant told the jury she always carried a gun, this court finds no manifest injustice or miscarriage of justice in Murphy's testimony that he saw two handguns in Appellant's purse within forty-eight hours before her arrest.

In denying relief on that basis, this court does not imply Murphy and Toby violated the Fourth Amendment to the Constitution of the United States or Article I, § 15 of the Constitution of Missouri when they looked in Appellant's purse. In that regard, the State insists the officers' action was permissible under *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), which says, *inter alia*:

"[T]here must be a narrowly drawn authority to permit a reasonable search for weapons for the protection of the police officer, where he has reason to believe that he is dealing with an armed and dangerous individual, regardless of whether he has probable cause to arrest the individual for a crime. The officer need not be absolutely certain that the

individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger."

392 U.S. at 27, 88 S.Ct. at 1883[26].

Here, (a) Murphy had previously bought marijuana from Appellant on two occasions, hence he was a witness to two crimes committed by her, (b) Deborah had told Murphy that Appellant believed he was a police officer[15] and that Appellant had been carrying a gun, and (c) Murphy, Deborah and Toby were being led by Appellant, late at night, to a clandestine destination where a marijuana buy was to occur. An argument can be made that in those circumstances, Murphy and Toby did not violate Appellant's constitutional right to be free from unreasonable searches by looking in her purse, during her absence from the vehicle, to see whether it contained a weapon. However, because of the basis on which this court has resolved Appellant's third point, it is unnecessary to ponder that argument.

Appellant's final point arises from Roussett's testimony. After Roussett described Appellant's arrest, the prosecutor showed Roussett Exhibit 3; then, before Roussett said anything, the prosecutor showed Roussett Exhibit 2. At that juncture, Appellant's lawyer asked for, and was granted, a "sidebar" conference, where this exchange occurred:

"[Appellant's lawyer]: Judge, I wanted to object to the exhibiting of a, another firearm that's not the subject to either Count I or Count II. I think that the—there's prejudice to the defendant by bringing out a gun that's not the one that they purported was the one pulled from her at the time of the arrest. This is prejudice on the unfair exhibiting of a weapon that's not a part of these pro-

ceedings. And I would, I guess, move for a mistrial at this time.

[Prosecutor]: I guess he's referring to—I grabbed the wrong gun first.

[Appellant's lawyer]: And it was displayed to the jurors.

THE COURT: Yeah, the Motion for a Mistrial will be denied."

Roussett thereupon identified Exhibit 2 as the pistol Appellant "had down the front of her pants" when he arrested her.

Roussett subsequently testified about his arrest of Jason Hamann, described earlier in this opinion. Roussett's testimony included this:

"Q   And, when you arrested him, did you, ah, check him for weapons?

A   Yes, sir.

Q   Did he have a gun?

A   Yes, sir, he did.

Q   And what kind of gun did he have?

A   He had a Llama brand .380 semi-automatic pistol."

The prosecutor showed Roussett Exhibit 3 and asked whether he recognized it. Roussett answered, "Yes, sir, I do." Roussett then explained how he recognized the exhibit. During Roussett's narrative, Appellant's lawyer objected that Exhibit 3 was irrelevant.

At a "sidebar" conference, the trial court ruled: "I don't think the fact that he's armed has anything to do with this case, and I think that's prejudicial to the defendant.... The fact that he's armed is irrelevant ... I'm going to sustain the objection."

After Roussett's testimony ended (21 pages later in the transcript), Appellant's lawyer moved for a mistrial "based on the presentation of ... Exhibit No. 3, that was identified as belonging to Jason Hamann[.]"

---

15.  Deborah testified that after Appellant expressed suspicion that Murphy was a police officer, Deborah told Appellant that Murphy "runs around" with Deborah's boyfriend and she (Deborah) trusted Murphy. It appeared to Deborah that her remarks satisfied Appellant.

The trial court denied the motion.

Appellant's fourth point:

"The trial court erred and abused its discretion in denying [Appellant's] request for a mistrial when the State showed Jason Hamann's gun to the jury, in violation of [Appellant's] rights to due process and a fair trial ... in that Jason's larger gun was not involved in this incident and had no probative value to support the charges for which Appellant stood trial, and the trial court acknowledged it was both irrelevant and prejudicial. The prejudicial visual impact of displaying Hamann's gun could not have been removed without a mistrial, because the jury was allowed to infer that the conspiracy went beyond just [Appellant] and [Deborah], but that [Appellant] had enlisted the aid of Jason Hamann as well, even though the State did not have enough evidence to implicate Hamann in the conspiracy."

 If evidence is improperly admitted, but other evidence before the jury establishes essentially the same facts, there is no prejudice and no reversible error. *State v. Zagorski*, 632 S.W.2d 475, 478 n. 2 (Mo. banc 1982); *State v. Shanz*, 716 S.W.2d 472, 479 (Mo.App. S.D.1986).

Here, Roussett testified *without objection* that Hamann was carrying a "Llama brand .380 semi-automatic pistol." Thus, even had the jurors never seen Exhibit 3, they would have known exactly what type weapon Hamann was carrying. Seeing Exhibit 3 added nothing to what the jurors learned from Roussett's unchallenged testimony. Consequently, even if the prosecutor was wrong in showing Exhibit 3 to Roussett, it is obvious Appellant suffered little, if any, prejudice.

Declaration of a mistrial is a drastic remedy that should be employed only in those extraordinary circumstances where prejudice to the accused can be removed in no other way. *State v. Davis*, 653 S.W.2d 167, 176[19] (Mo. banc 1983). Whether a mistrial should be declared rests largely within the discretion of the trial court, as it observes the incident and is in a better position than an appellate court to determine what prejudicial effect, if any, the incident has on the jury. *Id.* at [20]. A trial court's denial of a motion for mistrial will not be disturbed on appeal in the absence of an abuse of discretion. *Id.* at [21].

Because the jurors learned nothing from seeing Exhibit 3 that they did not learn from Roussett's testimony (received without objection), this court holds the trial court did not err in denying either of Appellant's requests for mistrial.

Appellant's fourth point is denied.

Judgment affirmed.

GARRISON, J., and BARNEY, C.J., concur.