STATE of Missouri, Respondent,

v.

Richard D. LAWRENCE, Appellant.

No. 23517.

Missouri Court of Appeals,
Southern District,
Division One.

Jan. 17, 2002.

Eric Hutson, Lebanon, for Appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., Richard A. Starnes, Asst. Atty. Gen., Jefferson City, for Respondent.

Before SHRUM, P.J., MONTGOMERY, J., and BARNEY, C.J.

PER CURIAM.

Richard D. Lawrence ("Defendant") appeals from a judgment of the Circuit Court of Laclede County following a jury conviction of felony driving while intoxicated, § 577.010 and § 577.023.3, and driving while suspended, § 302.321, RSMo 1995.[1] Defendant was sentenced as a prior and persistent offender, § 558.016, to concurrent terms of ten years in the Missouri Department of Corrections for driving while intoxicated and one year in the Laclede County Jail for driving while suspended.

Defendant raises four points of error on appeal. First, Defendant asserts the trial court erred in overruling Defendant's challenge for cause of two prospective jurors following voir dire. Second, Defendant posits trial court error in failing to sustain Defendant's request for mistrial and denying his request for a new trial after it was ascertained that one of the seated jurors was related to Defendant and was aware of his prior criminal history. Third, Defendant asseverates the trial court erred in refusing to allow a witness for Defendant to testify at the hearing on Defendant's motion for new trial. Fourth, Defendant submits the trial court erred in allowing, over Defendant's objection and motion to suppress, the "out-of-court and in-court identifications of the Defendant" by a witness who was unable to identify Defendant at his preliminary hearing. We affirm.

Defendant does not challenge the sufficiency of the evidence. "All evidence and inferences will be viewed in the light most favorable to the ruling of the trial court and we will disregard all contrary

1. All statutory references are to RSMo 1994, unless otherwise noted.

evidence and inferences." *State v. Evenson,* 35 S.W.3d 486, 488 (Mo.App.2000).

## FACTS.

On the afternoon of September 25, 1998, Deputy Greg Weddle ("Dep. Weddle") of the Laclede County Sheriff's Department was directing traffic at the intersection of Highway 5 and Route C in Laclede County. At approximately 3:15 p.m., as Dep. Weddle was directing traffic, he observed a black car that he identified as a Pontiac Firebird traveling north on Highway 5 approaching at a high rate of speed. Dep. Weddle observed the car swerve out of its lane several times before passing by his location, narrowly missing Dep. Weddle and his patrol vehicle. While Dep. Weddle did not get a good look at the driver, he observed that the driver had long, shoulder-length hair and was wearing a black t-shirt. He also noticed that the front windshield of the car was "cracked pretty good, shattered like, still intact but shattered." Although Dep. Weddle did not personally pursue the black car, he did radio dispatch and request assistance from the highway patrol in apprehending the driver of the black vehicle.

On that same day, shortly after the incident with Dep. Weddle, David Hudson, a resident of Laclede County, was traveling south on Highway 5. As he approached an area roughly 1.5 miles north of the intersection of Highway 5 and Route C he observed a late model black car that he described as either a "Trans Am, Z 28 [or] Firebird" traveling in a northerly direction, run another car off of the road. Mr. Hudson was forced to drive his vehicle off of the road into a driveway to avoid the black car as it approached him. The car came within roughly three feet of Mr. Hudson's vehicle as it passed him, causing Mr. Hudson to bring his vehicle to a stop. Mr. Hudson observed that the driver had long hair, and was not wearing a shirt. He also noticed that the black car "had a busted out windshield on the driver's side. Wasn't plum gone but it was shattered." After passing Mr. Hudson, the black car pulled into a nearby driveway.

When the black car stopped, Mr. Hudson pulled out an unloaded rifle with a scope and looked through the scope so that he could get a better look at the vehicle.[2] Mr. Hudson observed the driver exit the vehicle. The driver was the only person Mr. Hudson could see in the vehicle. While looking through the scope, Mr. Hudson watched the individual walk north for approximately thirty seconds until the person "went into the brush, trees." Mr. Hudson was able to get a good look at the driver and later identified the man as Defendant. After watching Defendant walk into the woods, Mr. Hudson continued down the road until he reached the intersection where Dep. Weddle was located. Mr. Hudson relayed the events he had observed to Dep. Weddle and then proceeded to his farm.

Several minutes later, while driving north on Highway 5, Mr. Hudson observed Defendant standing at the corner of Highway 5 and Route HH, approximately two miles north of Highway 5 and Route C. He decided to inform Dep. Weddle that he had seen Defendant so he turned around and proceeded back to Highway 5 and Route C. Dep. Weddle informed Mr. Hudson that

---

**2.** Mr. Hudson testified at trial that the scope he used was a "four star or five star, six by eighteen power scope," which he explained would magnify images "eighteen times then [sic] the naked eye." Thus he explained his view from one hundred to one hundred and fifty yards would appear through the scope as "five and half yards" to "eight, eight and a half, nine yards away."

a highway patrolman had detained Defendant.

Trooper Jason Riggs ("Trooper Riggs") of the Missouri Highway Patrol, was working on the afternoon of September 25, 1998, when he overheard radio traffic concerning the incident with Dep. Weddle. He also received a communication "that the vehicle that nearly struck [Dep. Weddle] had pulled into a private drive then the driver of the vehicle exited and started walking north on Highway 5." Trooper Riggs heard the driver described as a male subject with long hair, no shirt, wearing black sweat pants. At approximately 3:40 p.m., Trooper Riggs observed Defendant standing at the corner of Highway 5 and Route HH. Trooper Riggs stopped his vehicle and asked Defendant to come over next to him as Defendant was "standing fairly close to Highway 5." Trooper Riggs observed that Defendant was unsteady on his feet, his eyes were blood shot and watery, and his speech was slurred as he talked. The trooper observed that Defendant had a set of car keys in his hands, which he gave to Trooper Riggs upon request.[3] After asking Defendant to submit to some field sobriety tests, Trooper Riggs administered the horizontal gaze nystagmus test and determined that Defendant had failed the test. Defendant refused to perform any other field sobriety tests, and when asked if he'd been drinking, Defendant replied, "a lot." At that point, Trooper Riggs placed Defendant under arrest for driving while intoxicated and read him his Miranda rights.[4]

Trooper Riggs received an additional communication that informed him a witness was with Dep. Weddle, so he proceed-ed to the intersection of Highway 5 and Route C. Upon arriving at this location Mr. Hudson identified Defendant as the driver he had observed in the black car. Defendant was subsequently transported to the Laclede County Jail and charged with felony driving while intoxicated and driving while revoked.

At trial, Dep. Weddle, Mr. Hudson, and Trooper Riggs testified to the events as set out above. The jury returned a guilty verdict on both counts.

## DISCUSSION AND DECISION.

### I.

In his first point, Defendant alleges that the trial court erred in denying Defendant's challenge for cause as to two venire persons, Nancy Twenter ("Twenter") and Katherine Lyon ("Lyon"), because the "two potential jurors equivocated on voir dire as to whether they would be fair and impartial. . . ." As such, Defendant was forced to use his peremptory challenges on the two venire persons and was not afforded "a full panel of qualified jurors."

In support of his contention, Defendant cites to *State v. Wilson,* 998 S.W.2d 202, (Mo.App.1999), which stands for the proposition that "[a]n individual accused of a crime is entitled to a full panel of qualified jurors before he is required to expend his peremptory challenges. For a trial court to deny a legitimate challenge for cause constitutes an abuse of discretion and reversible error." *Id.* at 205 (quoting *State v. Walker,* 795 S.W.2d 522, 525 (Mo.App.1990) (citations omitted)). However, a closer reading of *Wilson* reveals that the challenged jurors

---

**3.** Later, Trooper Riggs went to Steve's Tire World, where the black car in question, a Pontiac Firebird, had been towed. The trooper noticed that the Firebird had a cracked windshield and that the keys Defendant had given him the day before started the Firebird.

**4.** *See Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

actually served as members of the jury in the trial. The two jurors challenged in the present case, Twenter and Lyon, were struck from the panel via use of peremptory strikes by Defendant. Because Defendant used his peremptory strikes to remove Twenter and Lyon, he is precluded by the provisions of section 494.480.4, RSMo 1997, from arguing that the failure of the trial court to strike them for cause was reversible error. *State v. Deck,* 994 S.W.2d 527, 538 (Mo. banc 1999); *State v. Brown,* 998 S.W.2d 531, 540 (Mo. banc 1999); *State v. Bishop,* 942 S.W.2d 945, 947 (Mo.App.1997).[5] Point denied.

## II.

In his second point, Defendant maintains the trial court erred in denying his request for a mistrial and a new trial because one of the jurors, Mandy Gormley, failed to disclose that she was related to Defendant and had knowledge of his prior criminal history, thus depriving Defendant of a fair trial by an impartial jury panel.

During voir dire, the State asked the prospective jurors if "anyone know[s] the Defendant, Richard Lawrence?" No one responded affirmatively to this question, including Mrs. Gormley. Defendant's trial counsel did not address this subject during voir dire. Mrs. Gormley was seated as a member of the jury.

On the second day of trial, just after the close of the State's evidence, Defendant asserts that he advised his trial counsel that he became aware that Mrs. Gormley was his niece, through marriage.[6] Defendant's trial counsel, in turn, informed the trial court of this revelation. Defense counsel explained to the trial court that Defendant had informed him during voir dire that the name Gormley sounded familiar to him and that he might have "a relative by that name." Defense counsel also reported to the trial court that, "[w]e went ahead and listened to some of the questioning by the state. They asked if anyone knew [Defendant]. She [juror Gormley] did not indicate that she did and quite frankly, Your Honor, at that point it didn't come up again and we just dismissed it."

Out of the presence of the other jurors the trial court called Mrs. Gormley to inquire about Defendant's claim that she was related to Defendant. The following exchange occurred:

The Court: Do you know or know of Mr. Lawrence.

Juror Gormley: No.

The Court: You don't know that you have ever seen or known of him.

Juror Gormley: No. I will say that after you read that address today, that he is in Richland, now my husband's mom at one time, I don't know her, we never talked to her, that her, I don't know her maiden name. One time her last name was Lawrence and kind of hit me then that there may have been, but I have know [sic] clue as to if there's any relationship there. But it just kind of hit me, but I don't know any of his family from his mom's side or his mom. Other than that, no.

---

**5.** Section 494.480.4, RSMo 1997, sets out, in pertinent part:

The qualifications of a juror on the panel from which peremptory challenges by the defense are made shall not constitute a ground for the granting of a motion for new trial or the reversal of a conviction or sentence *unless such juror served upon the jury at the defendant's trial and participated in the verdict rendered against the defendant.* (Emphasis added.)

**6.** Defendant's sister, Shirl Strutton, has a son, Johnny Gormley, to whom Mrs. Gormley is married.

The Court: Talking about your husband?

Juror Gormley: Yes.

The Court: What's his name?

Juror Gormley: Johnny Gormley.

The Court: So you don't know any of his relatives or any of his mom's?

Juror Gormley: Not on the mom's side, no.

The Court: And you said that you recalled that her name was once Lawrence?

Juror Gormley: At one time, he didn't know that much about his mom either and he thought at one time that could have been her last name. He didn't grow up around her at all.

Defendant then moved that Juror Gormley be removed from the empanelled jury and/or that a mistrial be granted. The trial court denied Defendant's motion, noting that Defendant did not pursue the existence of a relationship between Juror Gormley and Defendant during voir dire.

Following his conviction, Defendant filed several post-trial motions including a motion for new trial. During the hearing on Defendant's motion for new trial, he presented evidence showing that Juror Gormley knew of her relationship to Defendant.

Defendant's brother-in-law, Tom Strutton, testified at the motion for new trial that prior to Defendant's trial, Juror Gormley had occasion to have been shown family pictures of Defendant and had heard stories about Defendant's drug abuse and criminal history. Additionally, Defendant presented to the hearing court an affidavit signed by Shirl Strutton, discussed more fully *infra*, which related the same information.

Juror Gormley testified at the hearing on the motion for new trial. She related that she knew Shirl Strutton was her mother-in-law. However, to the question whether or not she was related to defendant, she answered, "Now I am." She also testified that while she had been to the home of Defendant's sister, she did not specifically remember viewing any photographs of Defendant or hearing stories of his past. Lastly, she denied ever having discussed Defendant with her husband.

The trial court denied Defendant's motion for new trial, noting that Juror Gormley had consistently stated that she did not know Defendant both during the Court's questioning during the trial and in the hearing on the motion for new trial. Further, the trial court observed that Defendant had failed to pursue the issue during voir dire.

"The decision to overrule a motion for mistrial or a motion for new trial will not be overturned absent a finding that the trial court abused its discretion." *State v. Hicks,* 959 S.W.2d 119, 122 (Mo.App.1997). While Defendant acknowledges that he informed his trial counsel during voir dire of the possibility that he was related to Juror Gormley, Defendant maintains that the matter was not pursued further in voir dire because "[Juror] Gormley did not acknowledge that she knew the Defendant— though she was directly asked whether she did."

However, "[t]he ability to disclose requires awareness of the information solicited during voir dire." *Farm Credit Services of Western MO, P.C.A. v. Slaughter,* 850 S.W.2d 433, 435–36 (Mo.App.1993). "To obtain a new trial on the grounds of juror nondisclosure, the moving party must show more than the existence of disqualifying information; that party must show that, when questioned, the juror knew about the information solicited, and that the juror concealed or failed to reveal his [or her] knowledge." *Id.; see also Kennedy v. Tallent,* 492 S.W.2d 33, 36

(Mo.App.1973); *State v. Chandler*, 314 S.W.2d 897, 900 (Mo.1958). Clearly, Defendant failed to convince the trial court that Juror Gormley intentionally concealed or failed to reveal knowledge of Defendant during voir dire. "We defer to the trial court's evaluation of the credibility of [a] witness...." *State v. Lord*, 43 S.W.3d 888, 891 (Mo.App.2001). We find no abuse of discretion in the trial court's ruling. Point denied.

### III.

In his third point, Defendant asseverates that the trial court erred by its refusal to allow Mrs. Shirl Strutton, Defendant's sister, to testify at the hearing for new trial. Early in the hearing, Defendant's trial counsel invoked the "rule on witnesses" and proceeded with opening statements while Mrs. Strutton was present in the courtroom. When Defendant's trial counsel called Mrs. Strutton as its first witness the trial court noted that she had been present in the courtroom and, accordingly, sustained the State's objection to her testimony.

Defendant submitted an offer of proof in the form of an affidavit previously signed by Mrs. Strutton, which replicated her proposed testimony and mirrored the testimony of her husband, Mr. Tom Strutton.[7] While the trial court refused to permit Mrs. Strutton to testify, it did allow Defendant to submit her affidavit into evidence.

■■■ A trial court has the authority to direct the exclusion of witnesses so that they will not be privy to testimony provided by other witnesses. *State v. Griffen*, 978 S.W.2d 445, 447 (Mo.App.1998); *State v. Tracy*, 918 S.W.2d 847, 850 (Mo.App. 1996). In the present case, the trial court

did so at the specific request of Defendant. "The remedy or sanction available to a court for violation of 'the rule' is to disqualify the offending witness from testifying." *Griffen*, 978 S.W.2d at 447.

However, violation of 'the rule' does not automatically warrant the exclusion of the witness who violates the rule. To the contrary, it is only when certain 'special circumstances' exist that a trial court should exclude the testimony of a witness who violates the witness exclusion rule. As a general rule, these 'special circumstances' exist only where there is proof that the witness violated the rule with 'the consent, connivance or procurement of the party or counsel calling him.'

*Id.* (citations omitted).

■■■ Defendant argues that the "rule on witnesses" should not have applied to Mrs. Strutton because she was the first witness and trial counsel "certainly was not aware that the [trial] Court would consider his keeping the first witness in the courtroom to be a violation of the rule." Defendant acknowledges that Mrs. Strutton was present with the consent of counsel, but posits that this consent was based on trial counsel's negligent view of the trial court's understanding of the rule on witnesses and was not a "connivance" or attempt to change Mrs. Strutton's testimony.

In support of his argument, Defendant cites to *State v. Shay*, 339 S.W.2d 799 (Mo.1960), a case in which the trial court excluded the testimony of two of three defense witnesses who were present in the courtroom and heard other testimony after the "rule on witnesses" had been invoked. *Id.* at 800.

---

7. Mr. Strutton's testimony was set out in Point II. With regard to Mrs. Strutton's affidavit submitted by Defendant, the trial court was informed by Defendant's trial counsel that Mrs. Strutton was "simply here to testify regarding the things that are set forth in the affidavit...."

In *Shay*, the Supreme Court determined that the trial court had abused its discretion in excluding the two witnesses. The high court observed that when a witness is in violation of the "rule on witnesses" without the "consent, connivance or procurement of the party or counsel calling him" he or she is not rendered incompetent to testify. *Id.* at 801.

The record does not support a finding that Defendant's trial counsel had "connived" or otherwise deliberately attempted to have Mrs. Strutton remain in the court room for purposes of altering her testimony. The trial court abused its discretion in holding otherwise. *See State v. Neria*, 526 S.W.2d 396, 399 (Mo.App.1975); *Shay*, 339 S.W.2d at 802. However, we find the trial court's abuse of discretion to be harmless beyond a reasonable doubt, as we conclude that Mrs. Strutton's testimony would have merely been cumulative to the testimony provided by her husband, Mr. Tom Strutton, as previously set out in Point II. *Neria*, 526 S.W.2d at 399. Additionally, the hearing court was privy to the particular facts of her proposed testimony, as it accepted Mrs. Strutton's affidavit into evidence which essentially replicated her proposed testimony. Point denied.

## IV.

In his fourth point, Defendant contends the trial court erred in permitting the "out-of-court" and "in-court" identification of Defendant by Mr. Hudson, over Defendant's objection and motion to suppress identification. Defendant maintains that Mr. Hudson was unable to identify Defendant at the preliminary hearing, the pre-trial hearing and at trial, and argues that Mr. Hudson's identification by a "one-on-one confrontation show-up and by a single photo were unduly suggestive and unreliable."

In determining whether this Court should exclude identification testimony, we must review the evidence and determine if the procedures utilized in the course of the identifications were impermissibly suggestive. *State v. Blanchard*, 920 S.W.2d 147, 149 (Mo.App.1996). "The crucial test for the admission of identification testimony is two-pronged: (1) was the pre-trial identification procedure impermissibly suggestive, and (2) if so, what impact did the suggestive procedure have upon the reliability of the identification." *State v. Moore*, 925 S.W.2d 466, 467 (Mo.App.1996); *State v. Secrease*, 859 S.W.2d 278, 279 (Mo.App.1993). Witness identification should be excluded only when the procedure was so suggestive that there exists a great likelihood of irrevocable misidentification. *Moore*, 925 S.W.2d at 467.

From our review of the record, we find little to support Defendant's contention that Trooper Riggs or Dep. Weddle employed overly suggestive means in presenting Defendant to Mr. Hudson for identification purposes. At most, Trooper Riggs merely asked Mr. Hudson if the individual seated in his patrol car—the Defendant—was the man he had seen driving the black car. "Pre-trial showups are valid under Missouri law even where the subject is in handcuffs and the officers say defendant is a suspect." *Id.; Secrease*, 859 S.W.2d at 279; *State v. Clark*, 809 S.W.2d 139, 142 (Mo.App.1991).

Assuming, arguendo, that the procedure was unduly suggestive, Mr. Hudson's identification of Defendant was reliable in any event.

Reliability is assessed under a totality of the circumstances considering the following factors: (1) the opportunity of the witness to view the criminal at the time of the crime; (2) the witness' degree of attention; (3) the accuracy of the witness' prior description of the crimi-

nal; (4) the level of certainty of identification demonstrated by the witness; and (5) the length of time between the crime and the subsequent identification.

*Secrease,* 859 S.W.2d at 279.

Here, Mr. Hudson testified that he had observed Defendant through a scope on his rifle for approximately thirty seconds, shortly after the incident in question. Mr. Hudson also related that he had experience in viewing items through the scope because he used the scope to view cattle tags at a distance for his farming operation. Furthermore, Mr. Hudson testified that he observed Defendant on a second occasion some twenty minutes after the first encounter, when Mr. Hudson observed Defendant standing on the roadside off of Highway 5. Mr. Hudson provided an accurate description of the man he had seen to Deputy Weddle and this description was, in turn, relayed to Trooper Riggs, who was easily able to employ Mr. Hudson's description in locating Defendant.

After locating Defendant, Trooper Riggs transported Defendant to the presence of Mr. Hudson, who readily identified Defendant as the man he had seen both through the scope and standing on the roadside. Mr. Hudson's pre-trial identification was reliable.

With regard to the in-court photo identification, Defendant alleges that Mr. Hudson's identification through use of the photo in court was improper because only one photo was shown, and Defendant's name was clearly labeled at the bottom of the picture.

■ Our review of the record, however, reveals a single photograph was introduced so that Mr. Hudson could identify Defendant through a photograph taken *at the time of his arrest because Defendant had changed his physical features from the time of his arrest to the date of trial,* roughly ten months, to the point that Mr. Hudson could not positively identify Defendant in court as the man he had seen on September 25, 1998. Under these circumstances, we find no prejudice in the in-court identification of Defendant by Mr. Hudson.

■ Even assuming an infirmity in Mr. Hudson's identification of Defendant, any error in its admission at trial was harmless beyond a reasonable doubt because other cumulative evidence at trial sufficiently established that Defendant was driving the car. *See State v. Clark,* 26 S.W.3d 448, 458 (Mo.App.2000). Both Dep. Weddle and Mr. Hudson testified that they were nearly hit by a black car with a broken windshield. Both described the driver as having long, dark hair. Minutes later Trooper Riggs saw Defendant standing at the same intersection where Mr. Hudson had previously observed him. Partly based on Mr. Hudson's description Trooper Riggs was able to apprehend Defendant. Defendant had a set of keys in his hand. One of the keys started the same black vehicle that both Mr. Hudson and Dep. Weddle had previously seen. Clearly there was sufficient evidence for the jury to find that Defendant was the driver of the car. Point denied.

The judgment is affirmed.