STATE of Missouri, Respondent,

v.

Danny DUNCAN, Appellant.

No. 21096.

Missouri Court of Appeals,
Southern District,
Division Two.

May 23, 1997.

Lew Kollias, Asst. Public Defender, Columbia, for appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., Christine M. Blegen, Asst. Atty. Gen., Jefferson City, for respondent.

CROW, Presiding Judge.

Appellant, Danny Duncan, charged with murder in the second degree, § 565.021.1, RSMo 1994, waived trial by jury,[1] stood trial before the court, and was found guilty as charged. The trial court sentenced Appellant to life imprisonment.

Appellant's sole point relied on in this appeal is:

"The trial court erred in overruling Appellant's motion to suppress his statement made to Officer Pritchett that he killed someone with a ball bat and in admitting this statement into evidence at trial because the statement should have been suppressed in that Appellant was in custody and was not read Miranda[2] warnings at the time the statement was made, and the statement was not volunteered but was in response to questioning."

Officer Pritchett, referred to in Appellant's point relied on, is a Steele, Missouri, police

1. Appellant was originally charged with murder in the first degree and armed criminal action. In exchange for Appellant's waiver of trial by jury, the prosecutor reduced the charge of murder in the first degree to murder in the second degree and dismissed the armed criminal action

charge. There were other elements in the agreement, but they are of no consequence.

2. *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

officer. Pritchett testified at a hearing on Appellant's motion to suppress and again at trial. Pritchett's uncontradicted testimony,[3] viewed favorably to the trial court's ruling, *State v. Blankenship*, 830 S.W.2d 1, 14[18] (Mo. banc 1992), established the following facts.

About 9:00 p.m., June 27, 1994, Pritchett was on duty in a patrol car in Steele. He was dispatched by radio to the residence of Doris Collins in response to a report that Appellant was causing a disturbance there.

En route to Doris's[4] residence, Pritchett saw Appellant walking across a street. Pritchett stopped and asked Appellant to get in the patrol car "on the passenger side." Appellant complied.

Pritchett asked Appellant what was going on at Doris's residence. Appellant replied that he had gone there "trying to get Rose to come back to him, they had been split up."

Upon arrival at Doris's residence, Pritchett saw several people, including Doris, "out in the yard." Doris told Pritchett that Appellant had been there and that "the people who called was Rose and Christy."[5] Doris added that Rose and Christy had gone to Christy's residence to make the call.

Pritchett drove to Christy's residence, where he saw "several subjects out in the roadway." The group included Rose Knight and Christy.

Rose told Pritchett that Appellant had been at Doris's residence "trying to get her [Rose] out of the house." Rose also disclosed that Appellant "had a knife and was threatening to kill everyone at that residence if they did not let him in so he could talk to her."

Appellant thereupon became "very belligerent." Pritchett recounted: "[Appellant] was yelling at Rosie telling her if he got in to [sic] trouble over this ... call, that he would tell everything he knew about the murder at the Steele Motel."

Rose thereupon told Appellant that "she did not do it[,] he did."

Appellant told Rose that she "would fry for capital murder." According to Pritchett, Appellant was very loud, angry, and was warning Rose that she better not get him in trouble. Pritchett added that Appellant "was cussing her and I believe he called her a whore."

Rose informed Pritchett she wanted to sign a complaint on Appellant for peace disturbance. Pritchett instructed Rose to come to the Steele City Hall to do so.

Pritchett then "took on off with [Appellant] in the car ... to get away from there, because I seen he was causing a problem." Pritchett's testimony continued:

"Q.  ... on the way to City Hall, did Danny Duncan say anything?

A.  Yes, he did. ... He told me that he had killed that mother f___ and that he had hit him in the head with a ballbat and stabbed him.

Q.  Did he say how many times he stabbed him?

A.  Yes, sir, he said he stabbed him two times.

Q.  When you went on that call to go to [Doris's residence], were you investigating a murder?

A.  No sir, I was not.

Q.  Were you even aware that a murder had taken place?

A.  No, sir.

Q.  Was, when, what Rose said and what Danny Duncan said, was that your first information that a murder had allegedly taken place?

A.  Yes, sir, it was.

Q.  Did Danny say anything else after that?

A.  On our way to City Hall I asked him who he had hit in the head and stabbed and he told me he said I'd tell you if you'd let me go, and I told him I

---

3. Appellant did not testify at the suppression hearing or at trial.

4. For brevity and clarity, we refer to the individuals mentioned in this opinion by forename or surname, as convenient. We mean no disrespect.

5. Christy is Christy Collins, a daughter of Doris.

couldn't let him go and I asked him again and he said I done told you if you'd promise to let me go, I'll tell you who I killed and took out and buried.

Q. Okay. Did he say where this person was buried?

A. No, sir, he did not.

Q. Did he say whether it was in town or in the country?

A. Said it was in the country.... [H]e said you cannot prove shit, he said, it's been too long."

At some point after arriving at City Hall, Pritchett asked another officer "if we had anybody missing." The officer informed Pritchett that Sam Lack, Jr., was missing.

Appellant's statements to Pritchett triggered an investigation into Lack's disappearance, culminating in Appellant's conviction of murdering Lack. That conviction is the subject of this appeal.

While Appellant does not challenge the sufficiency of the evidence to support the conviction, a synopsis of the evidence is necessary in resolving Appellant's claim of error.

Lack was approximately sixty years of age in the spring of 1994. He lived part of the time with a sister in Steele and part of the time with his mother and another of his sisters in Caruthersville. He had been in the Army; he received a "Veteran's check" the first of every month. The checks were mailed to the Caruthersville address. Lack picked up his check for May, 1994, around the first of that month.

Billy Sue Wallace worked at R & S Mini Mart in Steele in May, 1994. It was "next door" to the Steele Motel. Lack was a customer at the Mini Mart, where he had a charge account. On May 11, 1994, Lack gave Wallace a check in payment of his account. After that, Wallace never saw Lack again.

Lack owned a pickup truck. After May 11, 1994, Wallace saw Lack's pickup "parked at [the] back door of the store." It remained there about a month.

Neither of Lack's sisters saw him after May 11 or 12, 1994. They eventually became concerned because "his truck kept sitting parked there by the motel and we knew something was wrong." They "went to the motel and asked questions and no one knew anything."

Rose Ann Knight, the object of Appellant's anger during the episode of June 27, 1994 (described at the outset of this opinion), testified that she lived with Appellant in room 7 at the Steele Motel a "long time." [6] Rose knew Lack, describing him as "my friend."

Rose recalled an incident in which she, Appellant and Lack were sitting outside the motel drinking vodka. The trio entered room 7. There, according to Rose, Lack tried to grope her breasts, reached under her clothes with his hand, exposed his penis, and said he was going to have sex with her. Rose avowed she said no.

Lack's conduct made Appellant very angry. Appellant entered the bathroom and emerged with a "ballbat" in his hand. Appellant hit Lack on the head with the bat, whereupon Lack "[p]assed out in the floor."

Rose testified Appellant told her to stab Lack. She stabbed Lack twice in the chest, then Appellant stabbed Lack three times in the chest.

Next, said Rose, Appellant put Lack in the bathtub and, using an ax and a hammer, severed Lack's head, both arms, and both legs, from Lack's torso. The body parts were put into trash bags, which were then placed in a "trash can." The can was put on a "wheelbarrow thing" and taken from the room to a nearby dumpster.

Calvin Lily resided at the Steele Motel in the room next to Appellant and Rose in May, 1994. He recalled an evening where Lack, Appellant and Rose were drinking outside, near his window.

Lily saw Appellant drag Rose into their room by her hair. Lily then heard arguing between Lack and Appellant. Lack wanted to go to bed with Rose; Appellant said no.

6. Rose revealed on cross-examination that she spent ten years in a "mental institution" in Fort Wayne, Indiana. She did not remember the year she was released, but believed it was "in the past five years."

Rose "sounded like she was mad." She said, "[K]nock him in the head."

Lily heard something hit the wall, almost knocking his pictures off. He then heard a noise "like a thumping."

Later, Lily saw Appellant pushing a barrel on a "dolly" toward the dumpster. Upon reaching the dumpster, Appellant and Rose took three garbage bags from the barrel and put them in the dumpster.[7]

After waiting a few minutes, Lily went to the dumpster, opened one of the bags, and saw Lack's head with a big hole in the top. Lily returned to his room and shut the door.

Early the next morning, Appellant came to Lily's room and said, "You tell I'm going to kill you." Lily moved from the motel the next day.

The dumpster at the Steele Motel is emptied every day except Thursday. The contents are taken to a landfill. Efforts by investigators to locate Lack's remains at the landfill were unsuccessful.

Investigators found "blood splatters" on the wall in room 7 at the Steele Motel. Samples were taken to a laboratory and found "positive for human blood." However, without a blood sample from Lack, laboratory personnel could not determine whether any of the specimens from the motel were his.

In addition to Appellant's incriminatory statements to Pritchett, the State presented testimony from five other witnesses about incriminatory statements by Appellant.

Timothy Shane Collins, a son of Doris Collins, testified that around June 7, 1994, he had a conversation with Appellant in front of the Steele Motel. Timothy recounted that Appellant "told me to give his wife Rose a message to come back to him or else they was gonna do 50 years to life in the pen." Rose was living with Doris at that time.

Donald Harold Dodson testified he had a conversation with Appellant "after Sam Lack had turned up missing." The conversation occurred in front of the Steele Motel. Asked what Appellant said, Dodson answered, "He told me that he had killed Sam." Dodson's testimony continued:

"Q. Did he tell you what he did with Mr. Lack's body?

A. He just told me he cut him up.

Q. Did he say after he cut him up what he did with the body?

A. He told me he tried to fit him in a 55 gallon drum but he wouldn't fit.

Q. What did he say he did with it then?

A. He told me that he proceeded to cut him up.

Q. Okay. And then what did he do with the body after it was cut up?

A. He told me he throwed it in the dumpster behind the motel.

Q. Behind the Steele Motel. Did he tell you what he put the pieces of the body in before he put it in the dumpster?

A. Garbage bags.

Q. Did he say anything to you about telling this?

A. Yeah, he told me if I said anything about it, he told me not to say anything about it or else."

Julie Collins, a daughter of Doris Collins, was residing with Doris on June 27, 1994, the date of the episode described at the start of this opinion. Rose Knight was also living at Doris's residence. Julie recalled Appellant appearing at the door that night and demanding to speak to Rose. Julie recalled Appellant saying that if Rose did not talk to him, "we're both going to go down for capital murder."

Julie, Doris and Rose fled on foot to the residence of Julie's sister, Christy Collins. Julie recalled that when Pritchett and Appellant arrived at Christy's residence, Appellant "was telling Rose that she helped him kill that guy, that man, and that she stabbed him twice and that he stabbed him three times."

Doris Collins testified about Appellant's arrival at her residence on June 27, 1994.

---

7. Lily testified only a few minutes elapsed between the time he heard the noise and the time he saw Appellant move the barrel to the dumpster. Later in his testimony, Lily said he heard "all this comotion" [sic] around ten o'clock, and saw Appellant and Rose move the barrel to the dumpster about midnight.

Doris quoted Appellant as saying: "[Rose] helped me kill that S.O.B. And she knows she did, and if she don't come out and talk to me now, we're both going down for capital murder." Because Doris had no telephone, she, Julie and Rose ran to Christy's residence and called the police on Christy's phone.

Doris saw Appellant in Pritchett's police car at Christy's residence. Asked what occurred, Doris answered: "He started yelling at Rose and telling her to get her ass in the back seat of the car because she was going to prison with him, and she helped him kill that motherf___ and she knows she did, and, and he wasn't going down alone." Doris further quoted Appellant as saying, "I stabbed him three times and you stabbed him twice."

Christy Collins was at her residence when Doris, Julie and Rose arrived. Christy remained there until Pritchett arrived with Appellant in the patrol car. Christy testified about Appellant's statements; her recollection was virtually identical to that of Doris, recounted in the preceding paragraph.

■ It is clear from Appellant's point relied on and the argument following it that the statement Appellant believes the trial court should have excluded is Appellant's statement to Pritchett that he (Appellant) "killed that mother f___" and "hit him in the head with a ballbat" and stabbed him twice. We henceforth refer to that statement as "the challenged statement."

Obviously mindful that Miranda [8] warnings are not required when there is no custodial interrogation, *State v. Isa,* 850 S.W.2d 876, 894 (Mo. banc 1993), Appellant maintains he was in custody when he made the challenged statement.

At the *suppression hearing,* Pritchett was questioned about Appellant's arrest. Pritchett avowed Appellant was arrested at City Hall "after the complaint was signed." [9] This occurred "later that evening." The arrest "was for a municipal ordinance, disturbing the peace."

Appellant asserts: "Clearly, appellant was in custody from the time he was first ordered

into the cruiser by Pritchett for possible peace disturbance, until he was taken by Pritchett to City Hall and arrested initially for peace disturbance, later for murder."

The State insists Appellant voluntarily entered Pritchett's patrol car, was not handcuffed or otherwise restrained, and was not under arrest when he made the challenged statement en route to City Hall.

We believe it is inferable that when Rose told Pritchett at Christy's residence that she (Rose) wanted to sign a complaint against Appellant for peace disturbance, Pritchett decided to take Appellant to City Hall and keep him there long enough to enable Rose to get there and sign the complaint. The State tacitly concedes this, as its brief says: "Presumably, if [Rose] had not shown up at City Hall to sign the complaint for peace disturbance, appellant would have been released."

However, assuming *arguendo* that Appellant was in custody when he made the challenged statement, it is inferable he was in custody only because of the disturbance Pritchett had been assigned to quell, not because he was a murder suspect. There is case law holding that in such circumstances, no Miranda warnings are required.

In *State v. Bennett,* 30 Utah 2d 343, 517 P.2d 1029 (1973), *cert. denied,* 416 U.S. 992, 94 S.Ct. 2403, 40 L.Ed.2d 771 (1974), two men were confined in a drunk tank. When an officer checked the tank, he discovered one lying in a pool of blood on the floor; the other was asleep. The officer woke the sleeper and asked what happened. The man replied, "I killed the son of a bitch last night; he would not shut up." 517 P.2d at 1030–31.

Appealing from a conviction of murder in the second degree, the accused argued that the receipt in evidence of his incriminatory statement violated his Miranda rights. The Supreme Court of Utah disagreed, explaining: "The defendant was not in custody at the time for the crime of murder. He was being detained on another charge. The offi-

8. *Miranda v. Arizona,* footnote 2, *supra.*

9. It is inferable that the complaint was signed by

Rose; however, the record is not explicit about that.

cer simply wanted to know what had occurred." *Id.* at 1031[1].

Appellant argues that his remarks to Rose at Christy's residence "implicated both himself and Rose ... in a possible murder." Consequently, says Appellant, Pritchett should have immediately read him the Miranda warnings. Appellant asserts Pritchett gave no warnings prior to the challenged statement.

At the suppression hearing, Pritchett was questioned about giving Appellant the Miranda warnings. Pritchett stated he gave Appellant the warnings on the way to City Hall "by memory." Upon arrival, said Pritchett, he read the warnings to Appellant, and Appellant looked "at the Miranda paper." However, Pritchett admitted Appellant made the challenged statement "prior to him being read Miranda Rights."

If (1) *Bennett,* discussed earlier, does not offend the holding in *Miranda,*[10] and (2) Appellant was in custody only because of the disturbance, and not as a murder suspect, *Bennett* supplies authority for rejecting Appellant's claim of error. However, we need not, and do not, decide Appellant's claim of error on that basis.

In denying Appellant's motion to suppress, the trial court found Appellant's statements to Pritchett "were basically spontaneous."

In *Rhode Island v. Innis,* 446 U.S. 291, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980), the Supreme Court of the United States explained: "[T]he special procedural safeguards outlined in *Miranda* are required not where a suspect is simply taken into custody, but rather where a suspect in custody is subjected to interrogation." 446 U.S. at 300, 100 S.Ct. at 1689[4]. Continuing, *Innis* said: "We conclude that the *Miranda* safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent." *Id.* at [8]. Additionally, *Innis* cited the following passage from *Miranda,* 384 U.S. at 478, 86 S.Ct. at 1630: "Volunteered statements of any kind are not barred by the Fifth Amendment and their admissibility is not affected by our holding today." *Innis,* 446 U.S. at 300, 100 S.Ct. at 1689[3]. *See also: State v. Hampton,* 509 S.W.2d 139, 143[7, 8] (Mo.App.1974), where an arrestee's spontaneously volunteered statement prior to Miranda warnings was held admissible.

In reviewing the trial court's denial of Appellant's motion to suppress, we look only to determine whether the evidence was sufficient to support the ruling. *State v. Burkhardt,* 795 S.W.2d 399, 404[6] (Mo. banc 1990).

Pritchett's testimony regarding the journey with Appellant from Christy's residence to City Hall, quoted earlier in this opinion, is sufficient to support the trial court's finding that Appellant made the challenged statement spontaneously, not in response to interrogation by Pritchett. According to Pritchett's testimony, the only question he asked Appellant was who Appellant had hit in the head and stabbed. It is inferable from Pritchett's testimony that he asked that question after Appellant made the challenged statement.

Appellant cites us to a segment of Pritchett's testimony where Pritchett recounted he "had some conversations" with Appellant en route to City Hall, and that the purpose of those "communications" was to find out "if a murder really had happened." However, that segment of Pritchett's testimony does not establish that he posed any question to Appellant before Appellant made the challenged statement.

Viewing Pritchett's testimony favorably to the trial court's ruling, *Blankenship,* 830 S.W.2d at 14[18], we hold the trial court did not err in denying Appellant's motion to suppress the challenged statement.

■ However, even had that ruling been erroneous, reversal would not be mandatory.

In *State v. Fuente,* 871 S.W.2d 438 (Mo. banc 1994), the accused maintained on appeal that the trial court erred in refusing to suppress incriminatory statements the accused made to law enforcement officers. The Supreme Court of Missouri held it was unnecessary to decide that issue because the trial court's ruling would, at most, constitute

---

**10.** Footnote 2, *supra.*

harmless error. *Id.* at 443. The Supreme Court declared that an otherwise valid conviction should not be set aside if the reviewing court may confidently say, on the whole record, that the admission of an involuntary confession in evidence was harmless beyond a reasonable doubt. *Id.* Inasmuch as the incriminatory statements in *Fuente* were cumulative to other evidence, the Supreme Court held such statements did not contribute to the accused's conviction, hence any error in refusing to exclude them was harmless beyond a reasonable doubt. *Id.* at 444.

Here, the challenged statement was cumulative to statements Appellant made to Dodson, which Dodson recounted at trial. The challenged statement was also cumulative to statements Appellant made to Rose in the presence of Julie Collins, Doris Collins and Christy Collins. Each member of the Collins trio testified about the statements at trial.

Consistent with *Fuente,* we hold that even had the trial court erred in receiving the challenged statement in evidence, such error was harmless beyond a reasonable doubt.

Judgment affirmed.

PARRISH, J., and MONTGOMERY, C.J., concur.