**STATE of Missouri, Plaintiff–Respondent,**

v.

**Lester LOPEZ, Defendant–Appellant.**

No. 25535.

Missouri Court of Appeals, Southern District, Division Two.

March 10, 2004.

Ellen H. Flottman of Columbia, for appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen.; Nicole E. Gorovsky, Assistant Attorney General of Jefferson City, for Respondent.

JEFFREY W. BATES, Judge.

In an amended information, Lester Lopez ("Defendant") was charged with the class A felony of murder in the first degree for killing Sherri Westfall ("Victim") by beating her to death. *See* § 565.020.[1] A jury found Defendant guilty of committing the lesser-included offense of murder in the second degree and recommended life imprisonment as appropriate punishment for this crime. *See* § 556.046; § 565.021; § 565.025. In the trial court's judgment, it

followed the jury's recommendation and imposed a life sentence upon Defendant.

Defendant filed a timely notice of appeal from the judgment and presents one issue for decision: whether the trial court erred in denying his motion to suppress and admitting in evidence certain statements Defendant made to an investigating officer before Defendant received his *Miranda* warning.[2] After reviewing the entire record, however, we conclude that resolution of this issue is unnecessary to the disposition of Defendant's appeal. Even if the trial court's actions were erroneous for the reason Defendant suggests, the alleged errors did not contribute to Defendant's conviction and were harmless beyond a reasonable doubt. Therefore, we affirm the trial court's judgment.

## I. Facts and Procedural History

■ At Defendant's trial, the State presented all of the evidence. Defendant does not challenge the sufficiency of this evidence to sustain his conviction for second degree murder. In this appeal, we consider the facts and all reasonable inferences derived therefrom in a light most favorable to the verdict, and we reject all contrary evidence and inferences. *State v. Stanley,* 124 S.W.3d 70, 72 (Mo.App.2004); *State v. Wright,* 941 S.W.2d 877, 879 (Mo.App. 1997). Viewed from that perspective, the favorable evidence supporting the State's case against Defendant is set out below.

Defendant and Victim resided together at 1644 North Hillcrest ("Defendant's house") in Springfield, Missouri. Larry Carver lived in the same neighborhood as Defendant. At about 6:00 p.m. on April 6, 2001, Carver was sitting in the front yard of his home. Carver saw Victim leave Defendant's house and hide behind a shed

---

**1.** All references to statutes are to RSMo 2000 unless otherwise indicated.

**2.** *See Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

for about 30 minutes. During that time, Defendant exited his house, walked around it as if he were looking for Victim, and then reentered the house. Ten minutes later, Victim came out from behind the shed and went to another neighbor's house. After spending a few minutes there, Victim left that residence and returned to her hiding place behind the shed. Carver went inside his house for 30 minutes. When he came back outside, Victim had returned to Defendant's house and was lying on the back porch.

Terrie Swineberg also lived in the same neighborhood as Defendant. At about 10:30 or 11:00 p.m. on April 6th, Swineberg observed Victim run past Swineberg's bedroom window. Shortly after 11:00 p.m., she observed Defendant walk past her window. A few moments later, Swineberg observed Defendant returning to his house, dragging Victim behind him. As Defendant was leaving Swineberg's property, she saw him pick up a large stick and hit Victim with it.

At 4:18 a.m. on April 7, 2001, Defendant placed a 911 call asking for a medical response to his house. During this telephone call, Defendant stated that he had just awakened and found Victim unresponsive on the floor. Although Defendant thought Victim was dead, he asked the 911 dispatcher to send an ambulance to his home.

After Defendant made the 911 call, Springfield police officer Nathan Thomas ("Officer Thomas") was dispatched to Defendant's house. Officer Thomas arrived there at 4:21 a.m. At approximately the same time Officer Thomas got there, paramedics in an ambulance and a fire rescue crew also arrived. The paramedics were the first ones to enter Defendant's home, and Officer Thomas followed them inside. The group found Victim lying motionless and pale on the floor of the living room in front of the couch. Officer Thomas observed a laceration on Victim's left leg. Defendant was pacing back and forth near the Victim's feet. Officer Thomas learned from Defendant that there was no one else in the house. After one of the paramedics examined Victim, he pronounced her dead and stated that rigor mortis had already set in.

At this point, Officer Thomas and Defendant left the house and went out onto Defendant's back porch. At Officer Thomas' request, Defendant produced identification. Because Officer Thomas was the only policeman at the scene and Defendant was behaving strangely, Officer Thomas asked Defendant to sit down. Officer Thomas explained to Defendant that the purpose of this request was to get Defendant to calm down so he could supply the information Officer Thomas needed for his report. Defendant twice refused to sit down and then stated, "Go ahead and take me to jail. I don't care." Defendant's remarks and actions made Officer Thomas uncomfortable, so he placed Defendant in handcuffs and helped him sit down. Defendant was not under arrest and was only handcuffed for Officer Thomas' safety so he could obtain a measure of control over the situation.

Defendant quickly calmed down, and the handcuffs were removed within one or two minutes. Officer Thomas examined Defendant's identification and then asked him what had happened. Defendant stated that he had gotten home around 9:30 p.m. the prior evening. He and Victim argued about Defendant coming home late because he usually got home at 6:00 p.m. Defendant and Victim had fallen asleep in the living room about 12:30 a.m. Defendant was on the couch, and Victim was on the floor. When Defendant woke up at 3:30 a.m., he told Victim, "Come on, let's go to bed." Victim didn't answer, so Defendant

checked to make sure that she was breathing. After Defendant determined that Victim wasn't breathing and had no pulse, he started CPR.

While Officer Thomas was talking to Defendant, he asked to go inside the house to use the restroom. Officer Thomas refused to let Defendant go back inside because other officers had arrived at the scene by that time, and the house was secured with crime-scene tape so any evidence inside could be collected and preserved. Defendant was permitted to urinate in the back yard. Later, Defendant took a cigarette out of his pocket and asked to go back inside the house to obtain a lighter. After Officer Thomas refused Defendant's request several times, he became upset and stated, "It [doesn't] matter because [I'm] going to jail anyway." When Officer Thomas asked Defendant why he would go to jail, Defendant put his head down and said nothing more.

Officer Thomas and Defendant stayed on the back porch about 45 minutes. During that time, Defendant was not given a *Miranda* warning. Officer Thomas did not consider Defendant to be a suspect at that point, and he was not under arrest. He was being detained for questioning, which was standard police procedure for an incident of this nature. Shortly after 5:00 a.m., Defendant was transported to the Springfield Police Department police station.

After Defendant arrived at the police station, he was interviewed on two different occasions by Springfield police detective Scott Kamykowski ("Detective Kamykowski"). Detective Kamykowski questioned Defendant in an interview room at the police station, which was equipped with audio and video recording equipment. At the beginning of each interview, Detective Kamykowski orally advised Defendant of his *Miranda* rights, which Defendant waived. Defendant also signed a document waiving his right to remain silent and his right to advice of counsel before he was asked any questions by Detective Kamykowski.

The first interview took place at approximately 7:20 a.m. on April 7th. An edited version of this videotaped interview, lasting about one hour and 40 minutes, was played for the jury. During the first interview, Defendant made the following incriminating admissions.

Defendant was 5' 11' tall and weighed 220 pounds. Victim was 5' 2" tall and weighed 135 pounds. During the late evening hours of April 6th and the early morning hours of April 7th, Defendant admitted that he and Victim were arguing and that they engaged in two different fights. Defendant was very upset and angry. While arguing with Victim, Defendant slapped her face and neck with his open hand five or six times until she fell to the ground. He struck Victim in the face and in the chest with his fists. He repeatedly hit Victim. He kicked Victim because that is the way he fights. He tore Victim's clothes off while they were fighting. Victim might have hit a shelf with her head while they were fighting. Defendant had sex with Victim after the fighting stopped.

At about 1:00 a.m., Defendant noted that Victim's body was cold. He did not know what to do, so he spent the next 30 to 45 minutes smoking a cigarette and drinking two beers. When he tried to pick Victim up and flip her over, he heard fluids gurgling inside of her. He flipped her on her side to check her breathing, and a large amount of bloody fluid came out of her mouth. He wiped the blood and fluid from her face with a sock. After doing so, he saw that her face was bruised, and she had a black eye. Defendant performed CPR for 30 minutes. He did not call 911 be-

cause he knew that if he called, they would put him in jail.

By 2:30 a.m., Defendant knew Victim was dead. He called his sister-in-law, who was a nurse, and asked her what to do. She told him to call 911. During that call, Defendant said that he told his sister-in-law that he would probably go to jail because the police might say that he did this to Victim. After Defendant called 911, he put clothes on Victim, who was lying naked on the floor.

Defendant admitted that his altercation with Victim caused her death. There was no one else there when Victim was injured. Defendant admitted that her death was his responsibility. Defendant told Detective Kamykowski that, "If it comes to, any, who to blame, yes, you can blame me. I'll go to jail. I don't care." Later, Defendant reiterated that point by stating: "I really don't even care no more. You can throw me in jail. I don't care. You can give me the death penalty—people get that for, the same, what happened to her. I'll do it. I really don't care no more." Defendant made essentially the same statement again later in the interview: "I'll take full responsibility for what happened to her. Do what you want to do with me. You can put me in jail. Death penalty, I'd like that." Near the end of the interview, Defendant again told Detective Kamykowski: "You can put me in jail." At the conclusion of the first interview, Defendant was arrested, charged with second degree murder and taken down to the jail.

At the conclusion of the first interview with Defendant, Detective Kamykowski went to Defendant's house to examine the scene and Victim's body *in situ*. Springfield police sergeant Randall Latch ("Sergeant Latch") was already there. After obtaining a search warrant, Sergeant Latch had entered the house at approximately 8:20 a.m. and begun the process of evidence collection. Detective Kamykowski joined Sergeant Latch at Defendant's house and obtained a report about what had been found there, as well as personally viewing the body and the crime scene.

Sergeant Latch had examined and photographed Victim's body. He observed bruises all over Victim's body including her face, chest, shoulders, arms, back and abdomen. While inspecting the premises, Sergeant Latch collected the following items as evidence: (1) a torn white T-shirt; (2) a pair of torn women's panties; (3) a bra with the cups torn out of it; (4) a bloody sock; (5) clumps of hair gathered up from various locations in the house; (6) one pair of square-jawed pliers; (7) one pair of needle-nosed pliers; and (8) a carpenter's tool belt. Sergeant Latch found the tool belt as he entered the kitchen. The trash can in that room contained part of the torn panties, the bloodstained sock and some hair. The two pairs of pliers were found in the pantry. More hair was found on the dining room carpet, as well as the remnants of several broken knick-knacks. Sergeant Latch found the torn T-shirt, the torn bra, another part of the torn panties and more hair in the bedroom.

While Sergeant Latch was processing the crime scene, Medical Examiner Dr. Jim Spindler and other members of his team also were there examining Victim's body. Dr. Spindler observed that Victim's posture appeared unnatural, suggesting that she had been moved after she died. Victim's clothing also looked unusual and appeared to have been placed on her after she was unconscious or dead. Victim appeared to have sustained significant, multiple blunt trauma. Her eyes were black, and she had numerous bruises. One such bruise on her flank was over a foot in diameter.

Detective Kamykowski returned to the police station and interviewed Defendant a

second time at about 3:00 p.m. on April 7th. An edited version of this videotaped interview, lasting 29 minutes, was played for the jury. Defendant again made many incriminating statements during this interview. He admitted slapping Victim, hitting her with his fists and kicking her. During some of the time that Defendant kicked Victim, she was lying on the floor. He ripped her clothes off while they were fighting. He acknowledged that Victim might have been dead when he had sex with her. After Detective Kamykowski showed Defendant photographs that had been taken of Victim's injuries at the scene, Defendant acknowledged that he caused all of these injuries. No one else but him could have done it. He admitted that he must have hit Victim multiple times to cause this degree of injury to her. She was scared for her life. Defendant asked Detective Kamykowski if he should plead guilty to murder. Defendant stated that he was guilty because they were fighting. He then stated, "What I done to her, they should give that to me."

Dr. Spindler's later autopsy of Victim's body catalogued the massive injuries that Defendant had inflicted while beating Victim. These injuries included the following: (1) a one-half inch scalp laceration; (2) a fractured cheek bone; (3) a compound fracture of the nose, probably caused by an upward kick to the face, that was so severe her entire nose was essentially torn loose from her face; (4) defensive injuries, in the form of large bruises, to her left hand and arm; (5) much more severe defensive injuries, in the form of a broken right ulna and radius, to her right arm; (6) injuries to the nipples of both breasts that were caused by squeezing of the tissue by needle-nosed and square-jawed pliers; (7) bruising to her external genitalia caused by either blows or twisting; (8) fractures to 24 separate locations in Victim's rib cage; (9) hemorrhaging and collapsing of her lungs caused by the broken ribs puncturing the tissue; (10) a lacerated liver caused by both blows and punctures from the broken ribs; (11) a punctured diaphragm caused by the rib fractures; (12) a ruptured spleen; (13) bruised kidneys; (14) significant bruising of her intestines; (15) internal bleeding; (16) a subdural hematoma; and (17) swelling of the brain. Dr. Spindler opined that it would have taken a minimum of one hour for Defendant to inflict the number of injuries Dr. Spindler observed during Victim's autopsy.

Defendant was ultimately charged by amended information with first degree murder. Prior to trial, his attorney filed a motion to suppress the statements made by Defendant to Officer Thomas because Defendant had not yet been given his *Miranda* warning.[3] The trial court conducted an evidentiary hearing and denied the motion because Defendant was not subjected to custodial interrogation at the time the statements were made, and the questions posed to him were merely investigatory in nature. Defendant renewed this objection to Officer Thomas' testimony at trial and included this allegation of error in Defendant's motion for new trial. Therefore, the issue of whether these statements were properly admitted in evi-

---

3. This motion also sought to suppress statements Defendant made to Officer Mark Priebe while Defendant was being transported from his home to the police department and statements Defendant made to Detective Kamykowski at the police station. Defendant's statements to Officer Priebe are not relevant in this appeal because the jury did not hear any evidence concerning these statements at the trial. The statements Defendant made to Detective Kamykowski, on the other hand, are relevant because the videotaped interviews with Detective Kamykowski were shown to the jury, and Defendant has not challenged the admissibility of this evidence in his appeal.

dence has been properly preserved for our review. *See State v. Coyne,* 112 S.W.3d 439, 442–43 (Mo.App.2003); *Smith v. State,* 60 S.W.3d 31, 35 (Mo.App.2001).

## II. Discussion and Decision

█ In Defendant's single point relied on, he contends that the trial court erred in denying his motion to suppress, and in admitting evidence at trial, concerning the statements Defendant made to Officer Thomas at the scene. Defendant claims these statements were inadmissible because they were elicited during custodial interrogation before Defendant was given a *Miranda* warning. In contending that Defendant's conviction should be affirmed, the State makes two arguments. First, no *Miranda* warning was required because Defendant was not subjected to custodial interrogation and made the challenged statements in response to on-scene investigatory questions. Second, assuming a *Miranda* warning was required and these statements were obtained in violation of Defendant's Fifth Amendment rights, the error was harmless because the other evidence presented at trial to establish Defendant's guilt was overwhelming. We find the latter argument dispositive.

█ A properly-preserved federal constitutional error in a criminal trial does not require reversal and remand for a new trial if the reviewing court determines that the error was harmless beyond a reasonable doubt. *See Chapman v. California,* 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967); *State v. Dexter,* 954 S.W.2d 332, 344 (Mo. banc 1997). The burden is on the State to prove that the error complained of did not contribute to the verdict obtained. *Chapman,* 386 U.S. at 24; 87 S.Ct. 824; *see also Neder v. United States,* 527 U.S. 1, 15–16, 119 S.Ct. 1827, 144 L.Ed.2d 35 (1999); *State v. Whitfield,* 107 S.W.3d 253, 262 (Mo. banc 2003). In *Dela-*

*ware v. Van Arsdall,* 475 U.S. 673, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986), the Supreme Court explained the underlying rationale for adopting this harmless error rule:

> Since Chapman, we have repeatedly reaffirmed the principle that an otherwise valid conviction should not be set aside if the reviewing court may confidently say, on the whole record, that the constitutional error was harmless beyond a reasonable doubt. The harmless-error doctrine recognizes the principle that the central purpose of a criminal trial is to decide the factual question of the defendant's guilt or innocence and promotes public respect for the criminal process by focusing on the underlying fairness of the trial rather than on the virtually inevitable presence of immaterial error.

*Id.* at 681, 106 S.Ct. 1431 (citations omitted). Thus, our task here is to determine whether any statements Defendant made to Officer Thomas—assuming that they were improperly admitted in violation of Defendant's Fifth Amendment right against self-incrimination—contributed to Defendant's conviction for second degree murder. *See State v. Fuente,* 871 S.W.2d 438, 443–44 (Mo. banc 1994) (applying the *Chapman* harmless error analysis to an alleged violation of defendant's *Miranda* rights).

█ In examining the statements made to Officer Thomas by Defendant, we perceive only three that could conceivably tend to incriminate him:

1. The statement Defendant made when he refused to sit down and told Officer Thomas that he should "[g]o ahead and take me to jail. I don't care."

2. Defendant's admission that he and Victim had argued on the evening of April 6th because Defendant got home late.

3. The statement Defendant made when he tossed his cigarette away and said, "It [doesn't] matter because [I'm] going to jail anyway."

As this court stated in State v. Goucher, 111 S.W.3d 915 (Mo.App.2003), "Many errors of federal constitutional magnitude are subject to harmless error analysis. These violations are termed 'trial errors' because they occur during the presentation of the evidence to the jury and can be quantitatively assessed in the context of the other evidence." Id. at 917 (citations omitted). That observation is particularly apropos here because, in Defendant's appeal, he has not challenged the admission of the two videotaped statements that he gave to Detective Kamykowski. Both were played, in edited form, for the jury to watch at the trial. In these videotapes, Defendant repeated all of the foregoing statements and made a host of other statements that were far more incriminating. Consequently, we do not believe the admission of Officer Thomas' testimony contributed to Defendant's conviction. Even if the challenged statements that Defendant made to Officer Thomas had been excluded during the trial, we conclude that the jury still would have found Defendant guilty beyond a reasonable doubt of committing second degree murder. When evidence challenged on constitutional grounds is cumulative of other properly-admitted evidence, the disputed evidence could not have contributed to the defendant's conviction and is harmless beyond a reasonable doubt. See Fuente, 871 S.W.2d at 443–44; State v. Clark, 26 S.W.3d 448, 458 (Mo. App.2000); State v. Duncan, 945 S.W.2d 643, 648–49 (Mo.App.1997); State v. Schwendt, 645 S.W.2d 385, 386–87 (Mo. App.1983).

In reaching this conclusion, we have not ignored Defendant's argument that the admission of this testimony prejudiced him because, without those statements in evidence, the State would have been unable to argue that Defendant was "starting his story" at that time. We find that Defendant's argument lacks merit for two reasons.

First, the State's argument that Defendant was "starting his story" was premised on the statements Defendant made in the 911 telephone call, which was admitted without objection at the trial:

The next element that we have to talk about is that not only did he beat her to death but that he knew or was aware his conduct was causing Sherri's death. How do you know he knew what was going on? Starts back at that 911 tape. Starts working on his story. Because if you remember the tape-and I encourage you to ask to see the evidence. Look at the tapes. Look at the pictures. Listen to the 911 tape. Because he starts— he's already got the story going in his mind. He said he wakes up, and she's not breathing. He doesn't say anything about her being bloody, being bruised, being beaten. "I just woke up. I think she's dead." Well, he knew she was dead. He had been the one who had been pounding on her for a couple of hours. He started his story. He knew that he was going to be in trouble.

The State would have been able to make this argument regardless of whether or not Officer Thomas' testimony was admitted.

Second, we believe Defendant's own attorney used Defendant's statements to Officer Thomas to Defendant's advantage during closing argument. It is important to note that the State had charged Defendant with first degree murder and urged the jury to convict him of that offense throughout the trial. During the closing argument of Defendant's attorney, he reminded the jury that Defendant's behavior

was not consistent with the actions of a person who had committed first degree murder:

> Did he try to take her body outside? Put it behind the shed? Hide the body? No. He called a family member. Is that what a first degree murderer does? No, it's not. It's what someone does who realizes that they've done something they didn't intend to do, and now they're in deep trouble. Yeah. And he knew he was going to jail.

Following up on that theme, defense counsel later argued that someone who commits first degree murder does not show remorse. Defense counsel used Defendant's statements to Officer Thomas to help support this argument:

> Look at his actions when Officer Thomas responded to the scene. He was standing there staring, a blank stare, pacing back and forth, despondent. He goes outside. He just hangs his head. Take me to jail. I know I'm going to jail.

He's despondent. That is genuine remorse.

Since Defendant was not convicted of first degree murder by the jury, this argument appears to have been persuasive.

After reviewing the whole record, we conclude that the State has met its burden of showing that the admission of the statements Defendant made to Officer Thomas did not contribute to the jury's verdict that Defendant was guilty of second degree murder. We can confidently state that, if the error about which Defendant complains did occur, it was harmless beyond a reasonable doubt. The trial court's judgment is affirmed.

PARRISH, J. and SHRUM, J., concur.