STATE of Missouri, Respondent,

v.

Antoine ATCHISON, Appellant.

No. 28610.

Missouri Court of Appeals,
Southern District,
Division One.

Aug. 5, 2008.

Craig A. Johnston, Columbia, for appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., and Joshua N. Corman, Office of Attorney General, Jefferson City, for respondent.

DANIEL E. SCOTT, Presiding Judge.

Defendant Antoine Atchison appeals his first-degree murder and armed criminal action convictions. He does not challenge the sufficiency of the evidence. We view the facts and all reasonable inferences most favorably to the verdicts. *State v. Woodmansee*, 203 S.W.3d 287, 289 (Mo. App.2006).

## Facts and Background

Defendant called his mother to pick him up in the early morning hours of May 9, 2004. When she arrived with her boyfriend, James Lane, Defendant requested a ride to Chance Kitchen's house, claiming he needed to get his sister and nephew (who lived with Kitchen) out because someone was planning a drive-by shooting.

Defendant's mother drove Defendant, Lane, and Defendant's girlfriend to Kitchen's house sometime before 3 a.m. When they arrived, everyone got out and walked to the front door. Defendant's demeanor changed. Lane asked what was wrong. Defendant did not answer. Defendant's

mother knocked on the door. When Kitchen asked who it was, she identified herself and asked him to open the door.

Defendant meanwhile pulled and cocked a pistol. When Kitchen opened the door, Defendant pushed his mother aside and started firing at him. Kitchen said, "Antoine, what's that for, what is that? What is that for, Antoine?" Defendant fired about six shots, fatally wounding Kitchen, and fled in his mother's car, leaving everyone behind.

Defendant did not testify or present evidence in his defense at trial. The jury convicted him on both counts in less than two hours. His appeal raises three points.

## Point I

Defendant claims a *Miranda*[1] violation regarding jailhouse statements admitted against him at trial. Defendant was arrested on the day of the murder and, after signing a *Miranda* waiver, was briefly interviewed at the jail. Two days later, after further investigation, officers sought to interview him a second time. As they again tried to cover his *Miranda* rights, Defendant kept interrupting and asked what was going on. An officer replied that Defendant's family members had incriminated him; police had recovered two guns from his home; and "our case was made." Defendant said he would rather speak to his attorney. The officers called for a jailer, and while waiting, one said "We don't need to talk to you anyway, our case is made."[2] Defendant offered to bet that neither gun found at his home was the murder weapon, and kept taunting "I'll betcha, I'll betcha," until he was taken

---

1. *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

2. There was testimony that "Our case is made" was said before and after Defendant asked for an attorney. Our disposition of Point I makes it unnecessary to further consider if there were two such statements or a discrepancy about the timing of one statement.

away. Point I challenges the admission at trial of these "bets" and taunts.

■ To protect the Fifth Amendment privilege against self-incrimination, police must stop interrogating a custodial suspect who invokes his right to counsel. *State v. Harrison,* 213 S.W.3d 58, 68 (Mo.App. 2006). Interrogation must terminate "unless the accused himself initiates further communication, exchanges, or conversations with the police." *Id.* (quoting *Edwards v. Arizona,* 451 U.S. 477, 484–85, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981)). But not all custodial statements are products of interrogation. *Id.* (citing *Rhode Island v. Innis,* 446 U.S. 291, 299, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980)). "Interrogation" under *Miranda* includes express questioning and its functional equivalent— *i.e.,* words or actions "that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Innis,* 446 U.S. at 300–01, 100 S.Ct. 1682.

■ Defendant claims the police should have known that saying "We don't need to talk to you anyway, our case is made" was reasonably likely to elicit an incriminating reply; thus, it constituted further interrogation prohibited by *Miranda. Innis* suggests otherwise. That case involved police officers transporting a murder suspect who had invoked his right to remain silent until he consulted with a lawyer. *Id.* at 294, 298, 100 S.Ct. 1682. While en route, the officers discussed in the suspect's hearing the missing weapon; that a disabled children's school was nearby with "a lot of handicapped children running around;" and "God forbid one of them might find" a loaded weapon and be hurt. The suspect interrupted the conversation, led the officers to the gun, and gave incriminating statements. *Id.* at 294–95, 100 S.Ct. 1682. Rhode Island's high court

found a *Miranda* violation, but the Supreme Court reversed, concluding:

The case thus boils down to whether, in the context of a brief conversation, the officers should have known that the respondent would suddenly be moved to make a self-incriminating response. Given the fact that the entire conversation appears to have consisted of no more than a few off hand remarks, we cannot say that the officers should have known that it was reasonably likely that Innis would so respond. This is not a case where the police carried on a lengthy harangue in the presence of the suspect. Nor does the record support the respondent's contention that, under the circumstances, the officers' comments were particularly "evocative." It is our view, therefore, that the respondent was not subjected by the police to words or actions that the police should have known were reasonably likely to elicit an incriminating response from him.

*Id.* at 303, 100 S.Ct. 1682. The officer's statement and surrounding circumstances in this case are no more (and arguably are less) evocative than those in *Innis, Harrison,* or *State v. Wade,* 866 S.W.2d 908, 909–11 (Mo.App.1993).

■ Moreover, even if we found constitutional error—which we do not—in admitting Defendant's "bets" and taunts, we should not set aside an otherwise valid conviction if we can confidently say on the whole record that the error was harmless beyond a reasonable doubt. *State v. Duncan,* 945 S.W.2d 643, 649 (Mo.App.1997), *citing State v. Fuente,* 871 S.W.2d 438, 443 (Mo. banc 1994).

■ The whole record, including uncontradicted testimony of several eyewitnesses, convincingly shows that Defendant went to the victim's house; shot him repeatedly; fled by taking his mother's car

and leaving everyone else behind; then falsely told police he had not been there. Defendant offered no testimony or evidence in his own defense. We are confident that the jury would have convicted Defendant as it did, even without the challenged statements. Evidence challenged on constitutional grounds, if cumulative of properly-admitted evidence, could not have contributed to a conviction and is harmless beyond a reasonable doubt. *See State v. Lopez,* 128 S.W.3d 195, 202 (Mo.App.2004)(citing cases). We deny Point I.

## Point II

■ Defendant claims the trial court improperly kept him from asking potential jurors if they knew Maryann Clayton, allegedly the victim advocate.[3] In reviewing this point, we bear in mind our supreme court's admonition in *State v. Edwards,* 116 S.W.3d 511, 529 (Mo. banc 2003):

> The trial judge is in the best position "to judge whether a disclosure of facts

on *voir dire* sufficiently assures the defendant of an impartial trial without at the same time amounting to a prejudicial presentation of evidence." *State v. Leisure,* 749 S.W.2d 366, 373 (Mo. banc 1988). The ruling is reviewed for abuse of discretion. *Id.* at 374. Even where error occurs, to entitle defendant to relief, the prohibition on voir dire must have caused a "real probability of injury." *State v. Betts,* 646 S.W.2d 94, 98 (Mo. banc 1983);[4] *see also State v. Oates,* 12 S.W.3d 307, 310–11 (Mo. banc 2000).

Defendant has not persuaded us that the trial court abused its discretion. We cannot find, from our review of the record, that potential jurors knew or were told that Ms. Clayton was a victim advocate, or that she was identified in any other way, or that she testified or otherwise participated in the trial, or that the term "victim advocate" was mentioned during voir dire or the trial. The only jurors who said they knew her were stricken from the panel, so

---

**3.** The relevant portion of voir dire follows:
[DEFENSE COUNSEL]: Let's see. There were a number of you who know Mr. Cann. And so we're going to start with—first of all, let me go back. He asked specifically if anybody knows him. And, of course, he works in an office here in the courthouse. And there's other people that work with him, his assistants over there in the jury chairs. Does anybody think they know anybody else in the Prosecutor's Office that works for Mr. Cann or works with Mr. Cann?
[JUROR NO. 17]: Do all of them up there work for the Prosecutor's Office?
[DEFENSE COUNSEL]: No, I'm sorry.
[JUROR NO. 17]: Okay.
[DEFENSE COUNSEL]: This is Ken Richardson.
[JUROR NO. 17]: Okay.
[DEFENSE COUNSEL]: It's Mr. Cann's assistant—assistant prosecutor. Next to him is Angie Stinnett. She's one of his assistant as well—she's a paralegal. Maryann Clayton.

[JUROR No. 17]: I know her.
[DEFENSE COUNSEL]: You know Maryann. Okay. Let me go ahead and—raise your hand if you know Ms. Clayton? Okay. Juror No. 11, how do you know Ms. Clayton?
[JUROR NO. 11]: We're good friends.
[PROSECUTOR]: Judge, may we approach.
[THE COURT]: You may.
(A conference was held at the bench without the hearing of the prospective jurors as follows:)
[PROSECUTOR]: Judge, Maryann Clayton is not affiliated with my office at all. And it'd be totally irrelevant to even ask if her— would have any impact on this.
[DEFENSE COUNSEL]: Judge, she works around the court.
[THE COURT]: Nope. I'm not going to get into that right now. Sustained.

**4.** *Betts* was overruled, in part, on other grounds in *Joy v. Morrison,* 254 S.W.3d 885 (Mo. banc 2008).

their qualifications are no basis for reversal. RSMo § 494.480.4 (2000).

Defendant claims his questions "were designed to determine if any potential jurors held any preconceived notions or prejudices or biases based upon their association with a person who represented victims of crimes." But aside from inquiring if anyone knew Ms. Clayton—which defense counsel *did* ask—Defendant has not identified other questions he intended to ask, nor did he make any such record below. Nor has Defendant meaningfully ascribed any "real probability of injury" to his Point II claim. We deny Point II as well.

### Point III

■ Finally, Defendant asserts a violation of his Sixth Amendment right to speedy trial. He argues that his trial was more than three years after his initial arrest, and claims prejudice should be presumed from the delay and his lengthy pretrial incarceration.

Defendant was first charged in May 2004 and bound over shortly thereafter. After several continuances at Defendant's request, the State dismissed the case in July 2005; apparently due to unavailability of witnesses for the scheduled jury trial.

The State refiled charges one month later. Defendant requested and got a change of judge and at least one continuance. Defendant was not bound over, but was discharged, after a January 2006 preliminary hearing. The process essentially was repeated with similar results, and Defendant again was discharged in April 2006.

A grand jury indicted Defendant the following September, but he was not arrested until October 2006. He filed a *pro se* motion to dismiss, on Sixth Amendment grounds, on April 5, 2007. His counsel filed a similar motion on May 21, 2007. Defendant's jury trial started on June 6, 2007, and he was found guilty the next day.

*Barker v. Wingo*, 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972) established a four-prong balancing test for Sixth Amendment speedy trial claims. The factors to be weighed include: 1) length of delay, 2) reason for delay, 3) defendant's assertion of the right, and 4) prejudice to the defendant. *Id.* at 530, 92 S.Ct. 2182. We consider these factors in order.

*Length of Delay.* This court has considered delays of eight months or more "presumptively prejudicial." *See, e.g., State v. Williams*, 34 S.W.3d 440, 447 (Mo.App. 2001); *State v. Farris*, 877 S.W.2d 657, 659–60 (Mo.App.1994). This terminology is somewhat misleading with respect to *Barker's* fourth prong (prejudice to the defendant). Presumptive prejudice for first-prong purposes raises no such fourth-prong presumption; it is just a threshold below which a court need not even consider *Barker's* other factors. *See State ex rel. Wickline v. Casteel*, 729 S.W.2d 56, 59 (Mo.App.1987); *Farris*, 877 S.W.2d at 659–60. The State concedes this threshold was met,[5] so we proceed to the other three factors.

*Reason for Delay.* Defendant caused some of the delay. The four changes of judge and at least five other continuances he obtained must be subtracted from the total delay. *Buchli*, 152 S.W.3d at 308.

Most of the other delay appears attributable to the State's difficulty getting De-

---

**5.** However, since Defendant was free from April to October 2006, and the record suggests no bad faith by the State, the speedy trial clause does not apply to that period. *See*

*U.S. v. MacDonald*, 456 U.S. 1, 8–11, 102 S.Ct. 1497, 71 L.Ed.2d 696 (1982); *State v. Buchli*, 152 S.W.3d 289, 308 (Mo.App.2004).

fendant's companions to appear for court, and getting their cooperation when they did. The State cannot be totally faulted for this, nor does the record suggest deliberate delay for strategic advantage. Thus, this prong, if it weighs against the State at all, does so only slightly.

*Assertion of Right.* The third *Barker* factor is when and how the speedy trial issue is asserted. 407 U.S. at 531, 92 S.Ct. 2182; *State v. White,* 689 S.W.2d 699, 703 (Mo.App.1985). Defendant did not raise a Sixth Amendment claim[6] until April 5, 2007, almost three years after his initial arrest, and just two months before his trial. This weighs against Defendant in the *Barker* analysis. *See State v. Newman,* 256 S.W.3d 210, 215 (Mo.App., 2008); *White,* 689 S.W.2d at 703. Further, Defendant did not request a speedy trial, but asserted the delay only as a ground for dismissal. This also weighs against him. *Newman,* 256 S.W.3d 210, 216; *White,* 689 S.W.2d at 703; *State v. Nelson,* 719 S.W.2d 13, 19 (Mo.App.1986).

*Prejudice to Defendant.* This is the most important factor, with the paramount concern whether delay has impaired the ability to make a defense. *Newman,* 256 S.W.3d at 216; *Farris,* 877 S.W.2d at 663.

Defendant does not assert actual prejudice in any particular respect. Rather, he claims prejudice should be presumed solely from the delay. *Casteel* rejects such reasoning. 729 S.W.2d at 59–60. *See also State ex rel. McKee v. Riley,* 240 S.W.3d 720, 722 (Mo. banc 2007), which reiterates that "[m]ere delay accompanied by an assertion of one's right to a speedy trial is insufficient to entitle one to dismissal, however. A defendant also must show … that the delay has caused prejudice to the defendant."[7]

Defendant's failure to present evidence of actual prejudice weighs heavily against his claim. *Farris,* 877 S.W.2d at 663. Nor can we deduce such prejudice ourselves, as Defendant presented no defense and neither he nor the record suggests this was due to delay.

*Barker's* balancing test weighs against Defendant. We deny Point III, and affirm the judgment and convictions.

BARNEY and BATES, JJ., concur.

6. Defendant filed *pro se* speedy trial requests on other grounds, such as the Uniform Mandatory Disposition of Detainers Law, but has not pursued those claims on appeal.

7. *Doggett v. U.S.,* 505 U.S. 647, 112 S.Ct. 2686, 120 L.Ed.2d 520 (1992), cited by Defen-
dant, is distinguishable because it involved an 8½ year delay. Fourth-prong prejudice presumptions apparently are rarely indulged for delays less than five years. *See, e.g., U.S. v. Frye,* 489 F.3d 201, 210 (5th Cir.2007).